T. H. EGLEY

v.

The UNITED STATES, Electro-Voice, Inc., Third-Party Defendant.

No. 37–74.

United States Court of Claims.

April 19, 1978.

T. H. Egley, pro se.

William O. Geny, Washington, D.C., with whom was Asst. Atty. Gen. Barbara Allen Babcock, Washington, D.C., for defendant.

Marshall A. Burmeister, Chicago, Ill., attorney of record, for the third-party defendant.

Before NICHOLS, KASHIWA and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on plaintiff's exceptions to the recommended decision of Trial Judge Joseph V. Colaianni, filed April 5, 1977, pursuant to Rule 134(h), having been submitted upon the briefs and oral argument of plaintiff, *pro se,* and counsel for defendants. Upon consideration thereof, since the court agrees with the trial judge's recommended decision, as here-

inafter set forth,* it hereby affirms and adopts the decision as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF TRIAL JUDGE

COLAIANNI, Trial Judge: In this patent suit brought pursuant to 28 U.S.C. § 1498, plaintiff, Theodore H. Egley, seeks "reasonable and entire compensation" for the alleged unauthorized use by the Government of plaintiff's patented invention. The parties have agreed that the issues of infringement and/or validity of the patent would be first determined. The parties have further agreed that a determination of plaintiff's recovery, if any, would be deferred until after a final ruling by the court on the questions of infringement and validity.

The patent in suit, United States Patent No. 3,156,738 (hereinafter referred to as the "Kuskin" patent), issued on November 10, 1964, to William Kuskin for an invention entitled "Damped Magnetic Telephone Receiver." Plaintiff Theodore Egley is by mesne assignments the present owner of all right, title, and interest therein. For the reasons detailed below, it is concluded that claim 1 of plaintiff's patent, the only claim in issue, is invalid, and that plaintiff, therefore, is not entitled to recover.

### Background Technology

To understand the issues before the court it is necessary to explain briefly but adequately the operation of magnetic and dynamic transducers. To begin, a transducer is a device for converting one form of energy into another form, e. g., electrical energy into acoustical energy, or vice versa. A magnetic transducer has a stationary coil and a magnetic or ferromagnetic diaphragm element, which may be the whole diaphragm or a segment thereof. A permanent magnet adjacent the coil is normally used to bias the ferromagnetic element.

When a magnetic transducer is used as a microphone, sound waves impinge on the diaphragm and cause the magnetic or ferromagnetic element to move in response to the sound waves. The coil is thus subjected to a changing magnetic field and results in the generation of an electric signal which is proportional to the sound waves.

On the other hand, when a magnetic transducer is used as a receiver, an audio signal is fed through the coil causing an oscillating magnetic field. The ferromagnetic element, which is part of the diaphragm, moves in response to the oscillating magnetic field. As a result, the diaphragm moves in accordance with the audio signal to produce sound waves.

A dynamic transducer consists of a diaphragm with a coil of wire attached to its center. Typically, a permanent magnet is positioned adjacent the coil, and, as a result, the coil is surrounded with a stationary magnetic field.

To use a dynamic transducer as a microphone, the coil is connected to a device for receiving electric signals, such as an amplifier. Sound waves striking the diaphragm result in movement of the diaphragm as well as the attached coil. Movement of the coil through the stationary magnetic field induces an oscillating electric potential in the coil proportional to the motion of the diaphragm.

To use a dynamic transducer as a receiver or earphone, an audio signal in the form of an oscillating electric current is fed through the coil. The oscillating current generates corresponding oscillations in the magnetic field about the coil. In turn, the oscillations in the magnetic field cause corresponding oscillations in the amount of magnetic attraction or repulsion between the coil and the stationary magnetic field. These oscillations drive the coil and the attached diaphragm to produce sound.

It should, of course, be appreciated that all dynamic transducers are far from ideal.

---

* Whereas the court adopts the trial judge's separate findings of fact which are set forth in his report filed April 5, 1977, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

Their performance is thus affected by things such as electrical resistance, frictional forces, inertia of the diaphragm, etc. Nonetheless, assuming just for purposes of discussion that a system made up of an ideal dynamic microphone and an ideal dynamic receiver were possible, sound striking the first dynamic microphone would move the diaphragm and attached coil in time with the sound waves. An electrical signal whose amplitude varies identically with the sound waves would be induced in the coil. This signal upon reaching the dynamic receiver would cause a magnetic field in the coil which varies with the amplitude of the signal. The coil and attached diaphragm are driven to oscillate with the variation in the magnetic field, i. e., the second diaphragm is caused to oscillate in correspondence with the first. Thus, the sound emanating from the second diaphragm would be the same as the sound impinging on the first.

Of course, since the amplitude of the sound will attenuate between the source and the diaphragm of the microphone and since only a small amount of the acoustic energy is converted into an electric signal by a diaphragm which is small compared to the total region over which the sound waves are spread, and also since the sound is further attenuated as it moves from the receiver to the listener, even in an ideal system the sound radiating from the diaphragm of the receiver may be audibly different from the sound which impinged on the first diaphragm.

In reality, ideal transducers of course do not exist. One important phenomenon which detracts from an ideal transducer, and the one with which the Kuskin patent deals, is resonance. As determined by the physical parameters of the system, the same amount of energy will oscillate a diaphragm with a much greater amplitude at certain frequencies than at other frequencies. The frequencies at which this phenomenon occurs are called the resonant frequencies. In a microphone, this phenomenon results in sound waves near the resonant frequency producing a relatively large deflection of the diaphragm and coil and thus a corre-

spondingly larger electric output signal. Similarly, in an earphone the same electric signal near a resonant frequency will cause a greater diaphragm deflection than at other frequencies, causing sounds near this frequency to be louder. Plaintiff's invention was directed at overcoming the above-described resonant frequency phenomenon.

### The Invention

Seaview Electric Co. (hereinafter referred to as "Seaview"), by whom Mr. Kuskin was employed at the time of the making of the invention in suit, was awarded a supply contract by the United States to build magnetic receivers for the Army. The magnetic receivers were to comply with a Government-supplied specification that included certain humidity, submersion, and frequency requirements. Although the Government supplied Seaview with a receiver then in use, the record established that it failed to meet the specified Government requirements. Notwithstanding that the contract was not a development contract and the Government would not and did not pay for developing a new unit, Seaview undertook, at its own expense, to design a unit which would meet the Government's requirements. The Kuskin patent was obtained to protect the resulting new unit.

According to the patent, the Kuskin receiver, due to accurate damping, develops a substantially uniform acoustic output throughout the desired audio frequency range. In contrast, previous receivers experienced excessive amplitudes of vibration at and near their resonant frequencies. Another cited advantage of the Kuskin receiver is the availability of means to enable an adjustment in its frequency response in order to overcome variation in components. This not only results in substantial shortening of production time, but also enables correction to be made to fully assembled units which otherwise would have to be remanufactured or discarded.

In operation, the amplitude of vibrations of the diaphragm is controlled by precision

means that regulate the amount of air which passes between partitioned airspaces. The passage between the airspaces contains a porous compressible element, the porosity of which is accurately regulated by the pressure of a screw thereon which compresses it to the extent desired. by regulating the amount of air which flows between the partitioned airspaces, the movement of the diaphragm is also regulated or damped to eliminate the large unwanted deflections at the resonant frequencies. Upon assembly, the frequency response of the receiver is tested on an oscilloscope, and the pressure by the screw on the porous, compressible element is adjusted until the desired uniform frequency response (damping) is obtained.

In the preferred Kuskin embodiment, the receiver is housed in a hollow rear cup or casing. A centrally apertured disk is secured across the opened end of the rear casing. A circular diaphragm is peripherally supported on a circumferential projecting ledge of the disk such that the inner face of the diaphragm is spaced away from the disk. An annular well, formed about the central aperture of the disk, extends into the hollow rear casing. An annular magnet with its associated solenoid coil is located within the well, thus closing the central aperture.

In this manner, two airspaces, the first being defined by the region between the rear housing and the disk, and the second being defined by the region between the diaphragm and the disk, are formed. The first and second airspaces are connected by a small second aperture that is formed in the disk. A compressible, porous cylinder of cotton fibers is located on the rear housing side of the disk in a pocket which surrounds the connecting aperture. A screw extends through the rear of the housing and into the pocket for engagement with one end of the compressible cylinder. The other end of the compressible cylinder is positioned against the disk to completely cover the small second aperture formed therein. By operation of the externally accessible screw, the degree of pressure on the compressible cotton cylinder can be accurately adjusted; and, in turn, the passage of air through the connecting aperture from the airspaces on opposite sides of the disk can be regulated thereby to damp the diaphragm to the desired extent as shown by a testing means, such as an oscilloscope.

### The Patent Claim

Claim 1, the only claim which plaintiff alleges has been infringed by the United States, provides: [1]

1. In a receiver of the character described,

a casing comprising a hollow rear section providing a first closed air space,

a front cover connected to the rear section,

a vibratory disk back of and adjacent to the front cover,

a second disk closing the front of the first air space and disposed back of but spaced from the vibratory disk to provide a second closed air space,

said second disk separating the mentioned air spaces and having an aperture transversely therethrough and connecting said air spaces,

means for vibrating the vibratory disk, and adjustable means for regulating the air flow from one air space to the other through said aperture, said means comprising a porous compressible element and

precision means for varying the pressure on said element.

1. While plaintiff's posttrial papers urge that both claims 1 and 2 of the patent are infringed by the defendant, the submissions in response to the court's standard pretrial order only make reference to claim 1. In addition, the following colloquy occurred at trial:

MR. EGLEY: As exhibit 3, Plaintiff's exhibit 3, we have a chart showing the correlation of the patent 3,156,788 and the drawing just referred to as the assembly drawing of the alleged infringing device.

THE COURT: Now, that makes reference to what claim of the patent?

MR. EGLEY: Claim 1.

THE COURT: Is that the only claim?

MR. EGLEY: We're basing our claim on claim 1.

*The Alleged Infringing Device*

Plaintiff argues that the H–189/GR dynamic microphone covered by Military Specification Mil–H–55258B(EL) and shown in Army drawing SM–C–544246, with further details of each element being shown in drawings SM–B–544247 to SM–B–544261, infringes claim 1 of the Kuskin patent.

As shown by the drawings, the microphone is housed in a hollow closed rear cup. A centrally apertured disk is secured across the top of the cup. A cylindrical magnet which takes up most, but not all, of the opening is mounted in the central aperture. A circular diaphragm is shown to be circumferentially secured on the outward side of the disk. A coil attached to the diaphragm extends into the central aperture and around the cylindrical magnet. The central aperture of the disk connects a first airspace defined by the rear housing and the disk and a second airspace defined by the diaphragm and the disk. A compressible, porous ring of felt and a rigid washer surround the magnet and completely cover the central aperture. A pair of SPIROL pins[2] project through holes in the rear housing and engage the rigid washer. A conventional handpress is used to press the SPIROL pins against the rigid washer until the pressure by the felt ring against the periphery of the centrally apertured disk is adjusted to the point where the air passage between the two airspaces provides the damping required to achieve the desired frequency response from the diaphragm.

Defendant argues that plaintiff's claim should be denied on various grounds, including:

(1) that the H–189 microphone does not infringe claim 1 of the patent;

(2) that claim 1 of the patent is invalid under 35 U.S.C. § 102(a), (b) or (c);

(3) that claim 1 of the patent is obvious under 35 U.S.C. § 103 in view of the prior art; and

(4) that the patent is invalid under 35 U.S.C. § 112 since it does not contain an adequate specification and since the patent also fails to distinctly claim and particularly point out the invention.

Since, as will be described more fully hereinbelow, it is concluded that the structure covered by claim 1 was obvious within the meaning of 35 U.S.C. § 103 at the time that the Kuskin invention was made, this opinion does not treat any of defendant's other arguments.

*35 U.S.C. § 103*

Defendant contends that the Kuskin patent is invalid because it fails to meet the requirements of patentability set forth in 35 U.S.C. § 103. In support of its position, defendant has cited a number of prior patents, and, relies as well, upon the prior public use and sale of a Model 655 microphone that was built and sold by Electro-Voice, Inc., of Buchanan, Michigan, in the mid-1950's. Based on a showing that each of the elements of claim 1 appears at least once in the prior art, defendant contends that various combinations of two or more of the prior art patents render claim 1 of the Kuskin patent obvious.

The pertinence of references not considered by the Patent and Trademark Office, especially in this instance where the use of a compressible felt element to perform the same function in the same way as disclosed by the patent in suit is shown only in references that were not considered by the examiner, have long been held to seriously weaken the statutory presumption of validity afforded by 35 U.S.C. § 282. *General Electric Co. v. United States,* 191 USPQ 594, 607 (Ct.Cl., Trial Div. 1976, Per Curiam Slip Opinion filed Feb. 22, 1978).

However, the mere fact that each of the elements making up the combination covered by the claims in suit appears somewhere in the prior art of record does not by itself negate patentability. All structural inventions of necessity involve a combina-

2. A SPIROL pin is a tubelike cylindrical pin which, instead of being annular in cross section, is actually a spiral. Compressed like a spring, it exerts a radial force and thus results in a frictional hold on the surrounding walls.

tion of old elements, *i. e.,* gears, levers, tubes, bolts, etc. A new structure is patentable only because the elements are combined in a new and unobvious arrangement.

■ To evaluate validity properly under 35 U.S.C. § 103, consideration is necessary, as pointed out by the Supreme Court in *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), of the following factors:

(1) the scope of the prior art;

(2) the difference between the prior art and the claims in issue; and

(3) the level of ordinary skill in the art.

Additionally, secondary considerations, such as commercial success, satisfying a long-felt need, or the failure of others, reflect on the determination of obviousness under 35 U.S.C. § 103.

### The Prior Art

Many examples of prior art have been brought to the attention of the court. The most important examples are Austrian Patent No. 164714 to Rudolf Gorike issued on May 15, 1949, and the Electro-Voice Model 655 microphone which was on sale in the United States in the mid-1950's long before the filing date of the patent in suit.

The Gorike patent was considered by the examiner during the pendency of the Kuskin application in the Patent and Trademark Office. Indeed, the Gorike patent was relied upon by the examiner in an appeal to the Patent and Trademark Office Board of Appeals against subsequently cancelled claims. Although the subsequently cancelled claims are not before the court, it must be assumed that the examiner was well aware of this patent and specifically found claim 1 allowable over it.

The Gorike patent describes a structure for controlling the frequency characteristics of electroacoustical transducers, and, specifically, dynamic microphones, by acoustical damping. The Gorike patent explains that dimensional variations as well as other factors in the manufacturing of transducers make it essential that the frequency response of the unit be adjustable to provide a flat output over the audio range.

Figure 1 of the Gorike patent discloses a diaphragm clamped at its periphery to a rigid disk with a central aperture. The coil attached to the diaphragm extends into the aperture from above and a magnetic pole piece extends into the aperture from below. The disk and the magnetic pole piece are both mounted in a cup-shaped closed rear housing.

The damping means consists of an annular ring, which is biased for upward movement on the magnetic pole. The ring is provided with a flange on its upper surface that is capable of pressing against the disk, around the periphery of the central aperture. One or more screws are provided for spacing the annular ring away from the disk to thereby regulate the airflow through the central aperture by increasing or decreasing the gap between the annular ring and the disk. The top of the transducer, including the screws and the diaphragm, is covered by a removable perforated cover. Thus, the screws are accessible for adjustment after final assembly of the microphone. Changing the gap changes the amount of resistance or damping.

There is no suggestion in the Gorike patent that a felt or porous, compressible element may be used in conjunction with the acoustic damping obtained by the adjustable airgap.

The Electro-Voice Model 655 microphone head assembly is a dynamic microphone. The feature of interest here is the damping means employed.

The drawings of record show a plate or disk with a central aperture to which a diaphragm is circumferentially attached. Attached to the other side of the disk covering the central aperture is a damping chamber. The damping chamber is an annular exteriorly threaded sleeve with a broad perforate flange at the top. It is positioned against the disk in such a manner that air can only pass from an airspace between the diaphragm and disk through the central aperture of the disk and through the perforations in the flange into an airspace behind

the disk. To make this the only passage, a magnet and pole piece extend through and seal the center of the annular damping chamber.

The damping system comprises an annular felt washer which surrounds the annular damping chamber below the perforations in its annular flange. Below the felt washer is a nut mounted on the threaded outer annular surface of the damping chamber. The amount of damping is adjusted by moving the nut closer to the disk compressing the porous, compressible felt washer or moving the nut away from the disk allowing the washer to expand.

A similar design for adjusting the damping in a dynamic microphone by using a threaded nut to compress a felt ring against the connecting apertures is shown in United States Patent No. 3,061,690, issued to Frank Swinehart on October 30, 1962, on an application filed September 15, 1958. The Swinehart patent was not cited by the examiner.

Finally, United States Patent No. 1,915,-358, which issued to Leonard W. Giles on June 27, 1933, and which was considered by the examiner while the Kuskin application was pending in the Patent and Trademark Office, recognizes that electrodynamic transducers can be used to either transmit or receive sound waves. That this equivalence was generally recognized is further shown by F. Langford-Smith, Radiotron Designer's Handbook, 779 (4th ed. 1953) which states:

> A dynamic microphone is, in essence, a small version of a dynamic loudspeaker, and some are even used in a dual capacity.

### Scope of the Prior Art

The above-discussed prior art shows that the basic structure of magnetic and dynamic transducers was well known at the time of the Kuskin invention. The Giles patent and the Radiotron Designer's Handbook, *supra,* teach that the basic structure of a magnetic or dynamic transducer is usable either as a receiver or as a microphone. Further, the prior art, note especially the

Gorike patent and the Electro-Voice Model 655, illustrates damping mechanisms that can be used to eliminate the undesirable effects of resonance by controlling the flow of air to and from the space below the diaphragm. The Gorike patent shows an externally accessible damping adjustment on a fully assembled transducer and explains that the damping may require adjustment because transducers cannot be manufactured to tolerances that insure the response of the transducer to be flat over the desired audio range. In operation, Gorike discloses a mechanism which regulates the size of a restrictive passage through which air from a chamber behind the diaphragm must pass to a second chamber. The Electro-Voice Model 655 microphone and the Swinehart patent show adjustable damping mechanisms in which the adjustment is carried out by changing the degree of compression of a felt element through which the damping air must pass.

### Difference Between the Prior Art and the Claim

Both the Gorike patent and the Electro-Voice Model 655 are microphones, whereas claim 1 recites a "receiver" and also calls for a "means for vibrating the vibratory disk * * *." Although they are both able to function as receivers, and both have coils which, when hooked up to function as receivers, would be means for vibrating the diaphragm, neither expressly teaches this use. Thus, both have the structure necessary to function as required by claim 1, but differ in the suggested manner of use.

The relevancy of both Gorike and the Model 655 microphones as prior art is, however, in no way affected by the above distinction since plaintiff also recognizes that it is a distinction more in form than of substance. Particularly, plaintiff recognizes the relevancy of microphone art to his receiver patent by his reading of the above-referred to clause of claim 1 on the accused H–189 microphone.

The Gorike patent discloses each of the other elements of claim 1 of the Kuskin patent except that the adjustable regulat-

ing means does not include "a porous, compressible element * * *." The flow of air between the two airspaces is regulated by adjusting the effective size of the aperture through the fixed plate by positioning a movable annular ring closer or farther from the aperture. Screw means are provided which precisely adjust the distance between the annular ring and the fixed plate. The Gorike device differs from claim 1 of the Kuskin patent only in the absence of a porous, compressible element in the damping mechanism.

In the Electro-Voice Model 655 microphone a felt "porous, compressible member" is used to regulate the airflow between two air chambers. More specifically, the regulating means includes an annular threaded ring or knurled nut of a diameter greater than the aperture through the dividing disk. Rotating the nut moves it closer to the fixed dividing plate and compresses the annular felt element, while moving it away from the dividing plate expands the felt element. The compression of the felt element regulates the passage of air between the two airspaces. The adjustable means for regulating the airflow in the Electro-Voice Model 655 microphone is literally covered by the claim 1 language of the Kuskin patent.

However, the hollow rear section of the head assembly of the Electro-Voice Model 655 microphone is not closed. Instead, the assembly has at least one large slot which allows access to the adjustable regulating means, i. e., the knurled nut. If the rear section were closed, there would be no way to adjust the knurled nut without disassembly of the unit.

Defendant nonetheless argues that upon placing the head assembly into a housing, i. e., the handle of the microphone, that the unit is closed. This argument overlooks the fact that in the context of the Kuskin patent, it is the receiving unit itself, not the receptacle or headset into which it is intended to be placed, that is required to be closed.

Defendant's argument also ignores the fact that to adjust the 655 microphone it is

necessary to remove the head assembly from its handle, so that the rear section is not closed during adjustment. Thus, after adjustment and replacement of the head assembly into the closed rear section provided by the handle, there is no assurance that the device has been properly adjusted for maximum damping. In the Kuskin receiver, and, as well, in the Gorike reference the adjustment is possible without modification of the first and second air chambers. Thus, an adjustment for proper damping is assured.

It must, accordingly, be concluded that the Electro-Voice Model 655 microphone differs from claim 1 of the Kuskin patent in that the rear housing, and the space it defines, is not and cannot be closed.

### Level of Ordinary Skill

As shown by the Giles patent and the Radiotron Designer's Handbook, *supra,* and as underscored by plaintiff's assertion that a dynamic microphone infringes his magnetic receiver patent, it is apparent that persons skilled in the art of electroacoustic transducer design recognized microphones and receivers to be equivalent. It is also clear from the trial record and the prior art that one of ordinary skill in this art would look to both microphones and receivers for guidance when designing or redesigning a receiver. It would have been natural for Kuskin to turn to the Gorike patent and the Electro-Voice Model 655 microphone for guidance in designing his receiver.

The Gorike patent, which shows each element of the claim except (1) the "means for vibrating the vibratory disk" and (2) the "porous, compressible element," would have taught one of ordinary skill who was designing a receiver, of the desirability of an external damping adjustment and the structure by which it could be accomplished. It thus would have been obvious to one of ordinary skill in the transducer art to use the structure illustrated in the Gorike patent to provide adjustable damping to a receiver.

The Gorike device and the Model 655 microphone both regulate the flow of air between the two chambers by adjusting the spacing between an annular ring and a fixed plate. However, the Model 655 also employs a felt ring between the ring and the plate to enable a more precise regulation.

■ It is, of course, essential in evaluating an invention against the standards of 35 U.S.C. § 103 that hindsight and the disclosure of the patent in suit not be resorted to. *See Jamesbury Corp. v. United States,* 207 Ct.Cl. 516, 542, 518 F.2d 1384, 1398 (1975). Adherence to that principle is assured in this instance since all of the elements, and/or the motivation for a person skilled in the art to combine them in the manner taught by claim 1 of the patent in suit, are present in the prior art.

■ Specifically, it would have been obvious to one of ordinary skill in the art viewing both Gorike and the Model 655 microphone to add the felt washer ring to the adjustment mechanism described in the Gorike patent in the proper position between the flange and disk to perform the same function as it did in the Model 655 microphone. The test is whether the combination taken as a whole is new and unobvious. *Bowser, Inc. v. United States,* 181 Ct.Cl. 834, 844, 388 F.2d 346, 351 (1967). The combination, as a whole, that results from the addition of an old element in corresponding positions of interchangeable devices, especially where the addition produces only the function it is known to perform and no new or unexpected function, has long been held to be obvious within the meaning of 35 U.S.C. § 103. *See Ellicott Machine Corp. v. United States,* 186 Ct.Cl. 655, 667, 405 F.2d 1385, 1391 (1969).

### CONCLUSION

■ Because the structure of claim 1 of the Kuskin patent would have been obvious to one of ordinary skill in the art from the collective teachings of the Gorike patent and the Electro-Voice Model 655 microphone, claim 1 of the Kuskin patent must be held invalid for failing to meet the re-

quirements of 35 U.S.C. § 103. Accordingly, plaintiff is not entitled to recover and his petition is dismissed.

### CONCLUSION OF LAW

Upon the findings of fact and the foregoing opinion which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and his petition is dismissed.