**JANEX CORPORATION, Plaintiff,**

v.

**BRADLEY TIME, Elgin National Industries, Inc., Walt Disney Productions, and Children's Television Workshop, Defendants.**

No. 77 Civ. 966 (M.E.F.).

United States District Court,
S. D. New York.

Sept. 20, 1978.

Lawrence G. Kurland, Maurice B. Stiefel, Hubbell, Cohen, Stiefel & Gross, New York City, for plaintiff.

John M. Calimafde, James M. Rhodes, Jr., Hopgood, Calimafde, Kalil, Blaustein & Lieberman, New York City, for defendants.

OPINION

FRANKEL, District Judge.

On February 25, 1977, plaintiff Janex Corporation commenced this suit against Bradley Time, Elgin National Industries, Inc.,[1] Walt Disney Productions, Inc., and Children's Television Workshop, alleging patent infringement. The patent in dispute is No. 3,835,640, awarded to Alexander W. Hughes, President of Janex, for a character

---

1. The original complaint named Elgin Watch Co. An amended complaint substituted Elgin National Industries, Inc.

alarm clock with voice associated alarm. The clock, designed for children, is faced with a familiar cartoon character [2] whose voice serves as the alarm. The case is before the court on defendants' motion for summary judgment on the ground that the patent is void as obvious under 35 U.S.C. § 103.[3]

## I.

In *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966), the Court examined the nonobviousness requirement in 35 U.S.C. § 103 and wrote:

"While the ultimate question of patent validity is one of law, *[Great] A. & P. Tea Co. v. Supermarket [Equipment] Corp., supra,* [340 U.S. 147] at 155 [71 S.Ct. 127 at 131, 95 L.Ed. 162 (1950)], the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined."

This teaching shapes our consideration of defendants' motion.

### A. *The Patent in Issue*

The Hughes patent embodies five claims. Claim 1, which like all five claims is written in characteristically turgid patentese,[4] de-

**2.** Plaintiff's clocks feature Raggedy Ann and Andy, Batman and Robin, and Bugs Bunny. Bradley Time features Big Bird, Oscar the Grouch, and Mickey Mouse.

**3.** § 103 provides in relevant part:
"A patent may not be obtained * * * if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."
Defendants' motion papers made reference to a defense of anticipation under 35 U.S.C. § 102. The defense is not pressed, however, on the motion now being decided.

**4.** The five claims read as follows:
"1. An apparatus for providing a wake-up alarm signal comprising a housing including an alarm clock means mounted in said housing and having a face for displaying time indicia thereon, said clock including means for displaying said time indicia on said face; an identifiable character having an associated voice characteristic located adjacent said time display means; playback means mounted within said housing, said playback means including a prerecorded spoken wake-up message corresponding to and identifiable with said character for simulating a voice associated with said character as said wake-up alarm signal and means for providing said prerecorded spoken message; an alarm circuit comprising armable means for enabling said message providing means at a preset time corresponding to a predetermined time display on said clock face, said armable means being presettable prior to said preset time and trippable at said preset time to provide said spoken wake-up message.

"2. An apparatus in accordance with claim 1 wherein said armable means comprises first switch means presettable to arm said alarm circuit, said presettable first switch having a first position in which said alarm circuit is armed whereby said message providing means may be enabled and a second position in which said alarm circuit is disabled, said wake-up message only being provided when said first switch is in said first position, and a second *trippable switch connected in series with said* first switch, said second switch having a first position in which said alarm circuit is disabled and a second position in which said alarm circuit is enabled to provide said wake-up message, said second switch being operatively connected to said alarm clock means and being trippable from said first position to said second position by said alarm clock means at a position thereof corresponding to said present time.
"3. An apparatus in accordance with claim 2 wherein said playback means comprises a record having said prerecorded message thereon, *a transducer means engageable with said* record for picking up said message therefrom, and diaphragm means engageable with said transducer means for reproducing said message picked up thereby, said first switch further comprising first means engageable with said diaphragm in said second position of said first switch for disengaging said diaphragm from said transducer means to disable the reproduction of said prerecorded message.
"4. An apparatus in accordance with claim 3 wherein said transducer means is engageable with said record in an initial position at the beginning of *said message and advances to a* final position at the completion of said message said playback means further including resilient means for biasing said transducer means toward said initial position, said diaphragm engagement preventing the return of said trans-

scribes a character clock with a voice associated alarm. Claim 2 specifies the switching devices which open and close the electrical circuitry. Claims 3 and 4 describe the voice alarm mechanism—record, needle, and diaphragm—and the means for automatically resetting the voice alarm mechanism when the alarm is disabled. Claim 5 describes the means for resetting the voice alarm mechanism when the wake-up message is completed, so it can be repetitively reproduced. According to the patentee, the clock was designed to "solve the problem of waking a child in the morning and, moreover, actually making a child want to set the alarm so that he can be awakened by it." Affidavit of Alexander W. Hughes, at 6.

B. *Prior Art*

■ Defendants cite fourteen references—six United States manufacturing patents, three United States design patents, one German patent, and four unpatented devices—as the prior art that renders plaintiff's talking alarm clock obvious.[5]

1. Patent No. 652,156 (1900), issued to E. Treitschke, describes a phonographic clock which announces the time at regular intervals "in a very gentle way" "for the benefit of nervous people."

2. Patent No. 1,382,370 (1921), issued to O. Lindholm, describes a musical alarm clock, employing a full size phonograph to provide "an agreeable substitute for the ordinary harsh and noisy alarm clock."

3. Patent No. 1,424,516 (1922), issued to V. and J. Pinto, describes a clock connected to a phonograph "so that the clock intermit-

tently operates the phonograph." The patentee notes:

"It is obvious that the regular clock actuation to cause half hourly or quarterly announcements can be superseded by an adjustable actuating mechanism for giving an alarm, utilizing the rest of our invention unchanged except as to the announcement or record and that the only changes required for such an alarm would be in the position or character of the actuating devices, forming part of the connection between the clock and the lifting mechanism. We therefore contemplate including herein all such features as are capable of use with actuation for alarm purpose."

4. Patent No. 2,493,138 (1950), issued to B. H. Hathaway, describes a toy clock, faced with pictures of Jack and Jill and twelve barnyard animals; it is rotated by hand while reciting an accompanying teaching jingle.

5. Patent No. 3,135,084 (1964), issued to O. A. Kidder, describes a talking alarm clock which plays a recorded message at selected time intervals during the hour.

6. Patent No. 3,581,410 (1971), issued to W. L. Zeigner *et al.,* describes a hand operated clock attached to a phonograph device that announces the time.

7–9. The three design patents are Design 150,090 (1948) (C. E. Murphy), a clown clock; Design 158,685 (1950) (J. F. Punzak), a bird house clock; and Design 169,947 (1953) (Punzak), an owl clock.

10. German patent No. 922,940 (1954), issued to F. Sauerbrei, *et al.,* describes a figurated clock which employs a magnetic

ducer means to said initial position, said first switch diaphragm engageable means enabling said initial position return whenever said first switch is in said second position.

"5. An apparatus in accordance with claim 4 wherein said playback means further comprises second means engageable with said diaphragm and said transducer means at the completion of said message for temporarily disengaging said diaphragm from said transducer means for enabling said initial position return, said second diaphragm engageable means enabling said diaphragm to reengage said transducer means and again reproduce said message

upon return thereof to said initial position whereby said spoken wake-up message may be repetitively reproduced."

5. The examiner considered only five prior art references: the Lindholm patent, the Hathaway patent, the Kidder patent, the Zeigner patent, and the German patent issued to Sauerbrei, *et al.* The failure to consider pertinent prior art, especially the Pinto patent, weakens the statutory presumption of validity. *Labs., Inc. v. Guideline Instruments, Inc.,* 501 F.2d 1131, 1136 (2d Cir. 1974).

tape to produce a periodic message. The patent specification suggests that the figure should be chosen "to emphasiz[e] the advertising text."

11–14. The unpatented devices are the Mattel "talking dolls," introduced in the 1960's; the Bradley "music'n motion" alarm clocks, particularly the "whistling bird musical alarm [which] cheerfully whistles bird calls from its gilded cage to wake up its proud owner"; talking Bugs Bunny, Woody Woodpecker, Mother Goose and Mrs. Beasly dolls; and the familiar cuckoo clock.

## C. *The Obviousness of the Differences*

While proffering these fourteen prior art references, defendants rely most heavily on comparison of the Hughes patent with the 1922 Pinto patent. Figure 4, taken from the Hughes patent, shows its alarm circuitry.

FIG. 4.

The clock is set by depressing # 34, an on-off switch, and by setting the windup alarm clock # 12 in the conventional manner. When the clock hands reach the preset time, switch # 32 is tripped, closing the circuit between the clock, the battery source # 38, and the record drive motor # 36 located in the voice box, and thereby activating the prerecorded message.

Figure 8 in the Pinto patent illustrates almost identical circuitry.[6]

# 80 is described as a switch "to open the circuit completely when desired." The alarm trippable switch is shown as # 37 and # 39. # 49 is the phonograph motor and # 74 the battery.

■ The two patents differ in three basic ways. First, Hughes employs a voice box instead of the "cylinder form of phonograph" found in the Pinto clock. But the Hughes patent specification acknowledges that the talking box device is "conventional," and even lists a manufacturer from whom it can be purchased. Second, while both patents provide a means to reset the phonographic device on the completion of the message, the Hughes talking box resets itself if stopped in mid-message. The third difference is that the Hughes patent provides for a figurated clock with voice associated alarm. Defendants argue that this association of figure with voice was sufficiently foreshadowed by the prior art, particularly by the German advertising clock patent, so as to be obvious under 35 U.S.C. § 103. Plaintiff, bolstering its argument with affidavits from six toy industry veterans, contends that the combination of figure and associated voice in an alarm clock is unique and nonobvious. Both parties, however, have tended to slight the critical legal question on which summary judgment turns: whether some technical accomplishment is required for patentability. Surprisingly, the case law has rarely addressed this

---

**6.** To facilitate comparison the court has boxed-in the major elements of the Pinto patent, labelled the clock, and added # 37 to this view.

question head-on. But implicit in the cases is a negative answer.

Two post-*Graham* Supreme Court cases teach the need for technical achievement. The first, *Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc.*, 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969), involved a patent for the placement of a radiant heat burner on the side of a standard asphalt paving machine. The device, a combination of old elements, solved the problem of the poor bonding between asphalt strips (so called cold strips), which had plagued the paving industry. The Fourth Circuit, recognizing that the patentee had simply put extant technology to new use, nonetheless upheld the patent, 404 F.2d 450 (1968), writing (at 454):

"The District Court * * * viewed the question as if it were known that the answer lay in heat treatment and that a generator * * * would do the job * * *. [But the patentee's] contribution cannot be judged without reference to its salient feature, disclosure of the fact that the solution lay in the use of a specified kind of infra-red generator with the basic paving machine."

The Supreme Court unanimously reversed. The Court found insufficient for patentability the facts that (1) the plaintiff had conceived the idea of using radiant heat for continuous paving, whereas previously radiant heat had been used only to patch limited areas, and (2) experts had testified to their doubts that radiant heat would solve the cold strip problem. 396 U.S. at 58–59, 90 S.Ct. 305. The use of radiant heat was deemed a "successful venture," not a patentable invention.

The second case is *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976). There, the patent was awarded for a manure flush system that solved a problem "familiar on dairy farms since ancient times" by delivering water directly to the barn floor from a storage tank rather than through pipes or hoses. The Fifth Circuit, while recognizing that all the elements were old, had validated the patent, finding that "the concept of a controlled sheet of water to do the scouring and washing of the floor had not been used in barn construction." 474 F.2d 167, 169 (1973). The Circuit rejected as a test for patentability a showing of some non-trivial technical accomplishment. *Id.* at 173. The Supreme Court again unanimously reversed, holding that "the exploitation of the principle of gravity adds nothing to the sum of useful knowledge where there is no change in the respective functions of the elements of the combination." 425 U.S. at 282, 96 S.Ct. at 1537. A novel idea, standing alone, was not enough.[7]

Second Circuit cases also hold that technical achievement is required for patentability. Thus, in *Formal Fashions, Inc. v. Braiman Bows, Inc.*, 369 F.2d 536, 538 (1966), where the court invalidated a patent for a universal size cummerbund, the test employed was "what would be obvious to a hypothetical mechanic who, among other things, has the prior art in mind when he endeavors to solve the problem for which the patent is obtained." See also *Timely Products Corporation v. Arron*, 523 F.2d 288, 295 (1975). Perhaps most directly in point is *Lemelson v. Topper Corporation*, 450 F.2d 845 (1971), where the court considered a patent for a toy gun which emitted a ricocheting sound when fired. Invalidating the patent, the court held that "a person skilled in the mechanical arts *and who desired to produce a gun which would emit a ricocheting sound* could have found

---

7. See also the venerable case of *Rubber-Tip Pencil Company v. Howard*, 20 Wall. 498, 87 U.S. 498, 22 L.Ed. 410 (1874). Counsel for the patentee advised the Court (at 504):

"Lead-pencils have very long—longer than any living man remembers—been used to make marks. India-rubber has very long— longer than any living man remembers—been used to rub them out. But never until lately was india-rubber used for this purpose except in a form *dis* connected from the pencil.

But on a summer's morning of 1867, one Blair, a poor artist of Philadelphia, seeing that it will be more convenient to use it *on* his pencil than off, puts in a certain way, a piece of a certain shape, on the pencil and finding a great advantage in thus using such a piece, shows what he has done. Behold! thousands, hundreds of thousands and millions of rubber-tipped pencils at once appear."

The patent, however, was invalidated.

in the prior art ways, means, or suggestions as to how to do it." *Id.* at 848 (emphasis added). As the emphasized phrase shows, the obviousness or nonobviousness of the idea of a gun that would emit a ricocheting sound was of no consequence. The question, instead, was: *given that idea*, what technical problem was solved?[8]

■ *Shaw v. E. B. & A. C. Whiting Company*, 417 F.2d 1097 (2d Cir. 1969), and *U. S. Philips Corp. v. National Micronetics Inc.*, 550 F.2d 716 (2d Cir. 1977), on which plaintiff relies, are not to the contrary. In *Shaw*, a patent for an artificial filament used as brush bristle was upheld on a showing that the prior art, if taken at face value, disclosed that Shaw's filament could not be produced. In *Philips*, the patent in dispute detailed a process for the manufacture of a magnetic recording head used to store magnetic patterns on tape and retranslate them into sounds or pictures; the patented product solved a technical problem that had bedeviled the industry despite continuous experimentation. Here, the patentee made no such problem-solving contribution.[9] The commercially successful idea, as events proved it to be, of a mythical face and associated sound in an alarm clock was not even a substantial challenge for a modestly talented mechanic to implement. Having that idea for a species of product, however profitable, "solved" no "problem" in any relevant sense of the words. The figurated clock with voice associated alarm is a successful venture, not a patentable invention.

## II.

■ A few final words are necessary concerning the appropriateness of summary judgment on the record before the court. Plaintiff has submitted affidavits from six "expert" witnesses, all averring that the Hughes patent is nonobvious. Defendants have provided no counter affidavits. Relying on *J. P. Furniture Company, Inc. v. Litton Business System, Inc.*, 436 F.Supp. 380 (S.D.N.Y.1977), plaintiff argues that a court presented with unrebutted expert opinion should not invalidate a patent on summary judgment. See also *Rains v. Cascade Industries, Inc.*, 402 F.2d 241, 247 (3rd Cir. 1968). But it has also been held that the mere presence of affidavits from people styled as experts asserting nonobviousness does not preclude summary judgment. *Research Corporation v. Nasco Industries, Inc.*, 501 F.2d 358, 361 (7th Cir. 1974); *A R Inc. v. Electro-Voice, Inc.*, 311 F.2d 508 (7th Cir. 1962); *Methode Electronics, Inc. v. Elco Corporation*, 385 F.2d 138 (3rd Cir. 1967). Despite some early indications to the contrary, it is now well settled that the principles governing the grant or denial of summary judgment in patent actions are the same as in other civil actions. *C–Thru Products, Inc. v. Uniflex, Inc.*, 397 F.2d 952 (2d Cir. 1968); *Monaplastics, Inc. v. Caldor, Inc.*, 378 F.2d 20 (2d Cir. 1967); 6 Moore ¶ 56.17[44], at 56–992–993. Summary judgment is appropriate where there are no genuine issues of material fact and where expert testimony is unnecessary either to elucidate the patent or assist the court in applying the obviousness test.

■ The affidavits submitted by plaintiff's six experts contain bald conclusions on the ultimate issue of obviousness and evidence of the talking clock's commercial success; they do not even suggest any technical problem the patentee solved or indicate any technical innovation he made. The court is told simply that plaintiff's clock has had "dramatic impact on our business" (Ziv affidavit, at 3); that it is "truly more than a toy" and an enormous commercial success (Ferretti affidavit at 5); that there has never been "anything like" the Janex clock

---

8. Cases in other circuits support this focus on the means employed by the patentee rather than the obviousness or nonobviousness of his idea. *Sterner Lighting, Inc. v. Allied Electrical Supply, Inc.*, 431 F.2d 539, 542 (5th Cir. 1970); *Research Corporation v. Nasco*, 501 F.2d 358 (7th Cir. 1974); *Republic Industries, Inc. v. Schlage Lock Co.*, 433 F.Supp. 666 (S.D.Ill. 1977).

9. Professor Kitch has observed that this focus on problem-solving accords with the economic justification for a patent monopoly as an incentive to making expenditures on experimentation that otherwise might not occur in a competitive system. 1966 S.Ct.Rev. 293, 340–41.

(Doyle at 3); that its "overall combination of features" renders it a "unique" invention (May affidavit at 3); and that the children's alarm clock market was, in what sounds like a patent anomaly, "dormant" prior to the introduction of plaintiff's clock (Hughes at 2). These averments demonstrate novelty, but are essentially irrelevant to the question of obviousness which the court must decide. And it is well established that commercial success "cannot breathe life into a patent otherwise invalid because of obviousness." *Continental Can Company v. Old Dominion Box Company*, 393 F.2d 321 (2d Cir. 1968).[10]

Courts have been admonished to be diffident about their engineering expertise. *Reiner v. I. Leon Co.*, 285 F.2d 501, 503–504 (2d Cir. 1960) (Learned Hand). This court qualifies notably, and votes unreservedly, for this admonition. It remains our duty, nonetheless, to discern whether there are factual issues to try and, if not, to foreclose wasteful use of scarce trial time. Here, there is no need for further factual development. The papers before the court establish beyond peradventure that the patentee has failed to solve any non-trivial technical problem warranting the award of a patent.

Accordingly, the defendants' motion for summary judgment invalidating the patent as obvious is granted. The complaint is dismissed.

It is so ordered.

---

**10.** Equally unpersuasive is plaintiff's evidence that defendants copied its clock. While copying may be powerful evidence of nonobviousness, *Kurtz v. Belle Hat Lining Co.*, 280 F. 277, 281 (2d Cir. 1922), it remains the case that nothing deters a competitor from borrowing from a product not covered by a valid patent.