INTERCONNECT PLANNING CORPORATION, Plaintiff,

v.

Thomas E. FEIL, Robert O. Carpenter, V Bank Systems, Inc., and Turret Equipment Corp., Defendants.

No. 80 Civ. 6602 (KTD).

United States District Court, S. D. New York.

June 2, 1982.

Morgan, Finnegan, Pine, Foley & Lee, New York City, for plaintiff; Jerome G. Lee, Alfred P. Ewert, Christopher A. Hughes, New York City, of counsel.

Towne, Dolgin, Furlaud, Sawyier & Owen, and Berger, Steingut, Weiner, Fox & Stern, New York City, for defendants Thomas E. Feil and V Band Systems, Inc.; Daniel Dolgin, Peter R. Stern, and Hubbell, Cohen, Stiefel & Gross, New York City, of counsel.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

In this action alleging patent infringement, defendants have moved for summary judgment.[1] Plaintiff Interconnect Planning Corporation ("IPC"), a New York corporation which manufactures various telephone equipment, contends that defendants Thomas E. Feil ("Feil"), Robert O. Carpenter, V Band Systems, Inc. ("V Band") and Turret Equipment Corp. have infringed plaintiff's patent for an electronic multi-line telephone system. Defendants argue on the instant summary judgment motion that the plaintiff's patent covered subject matter that was fully anticipated by the prior art at the time of the alleged invention, and that the patented subject matter would have been obvious at the time of the invention to one skilled in the relevant art. A review of the available record leaves no doubt that plaintiff's patented system as a whole was obvious at the time of its invention, and accordingly defendants' motion is granted.

## BACKGROUND

Certain facts are undisputed. Beginning shortly after IPC's founding in 1974, defendant Feil served as vice-president and director of the telephone equipment concern. Feil also held the title of Director of Engineering of IPC. During his tenure at IPC, Feil designed a trader turret system. Briefly, this system consists of large telephones each with as many as one hundred and sixty keys that represent separate telephone lines. The user of the telephone can use any one of the telephone lines simply by pressing any one of the keys. This trader turret system will be described more fully later in my analysis of the parties' contentions.

In December, 1974, Feil applied for a patent covering his trader turret. While the patent was pending, in October, 1975, Feil assigned his patent application over to IPC. In return, Feil received 31 shares of plaintiff's stock plus an employment contract.[2] In November, 1976, Feil's invention was patented under U.S. Patent No. 3,991,282 ("the '282 patent").

At the time the patent was granted, none of the parties, including Feil, were aware of any prior art which disclosed the invention. After the patent was issued, however, Feil learned of two items which allegedly disclosed the invention in the '282 patent. These items were two *Bell Laboratories Record* articles: "Voice Communication

---

1. The complaint in this action originally included an additional claim for unfair competition based upon an alleged misappropriation of trade secrets. This second claim was dismissed at the conclusion of a hearing on plaintiff's motion for a preliminary injunction.

2. These shares, according to the plaintiff, constituted about 18 percent of IPC's outstanding shares, and increased Feil's ownership of IPC to almost 27 percent.

System For Air Traffic Control," by M. E. Ozenberger, *Bell Laboratories Record*, May 1961, pages 154–60 (the "Ozenberger Article"), and "A New Switching System For Right-of-Way Companies", *Bell Laboratories Record*, April, 1968, pages 117–20 (the "Keith Article".) It is uncontroverted that these two articles were not considered by the patent examiner during the prosecution of the patent in suit. IPC has recently filed an application for reissue of the '282 patent citing only the Ozenberger Article as material overlooked by the examiner. No decision on this application has yet been made.

In February, 1980, Feil left IPC and joined V Band, a company established to manufacture and market trader turret equipment. Mr. Feil is presently chief executive officer and one-half owner of V Band. Evidently, Feil formed V Band in 1977 while working at IPC. The V Band product is similar to that produced by IPC under the '282 patent.

The instant action was commenced in November, 1980 against Feil, V Band, Robert O. Carpenter, an officer of V Band, and Turret Equipment Corp., a subsidiary of V Band, and originally asserted one count for patent infringement and another for unfair competition. Upon commencing this action, IPC moved for a preliminary injunction. Feil and V Band subsequently asserted counterclaims against IPC alleging various antitrust violations by plaintiff, including misuse of its '282 patent.

On December 3 and 4, 1980, a hearing on plaintiff's motion for injunctive relief was held. At the conclusion of those hearings, I denied the motion for a preliminary injunction and granted a motion by defendants for summary judgment on plaintiff's unfair competition claim.

Defendants now move for summary judgment on plaintiff's remaining claim for patent infringement. The basis for this motion is that the '282 patent was improvidently awarded because its purported novelties were obvious to persons possessing ordinary skills in the area of telephone trader turrets.

## DISCUSSION

Federal patent law provides generally that a person shall be entitled to a patent unless the invention is already known or patented. *See* 35 U.S.C. § 102.[3] The patent laws further provide that a

patent may not be obtained though the invention is not identically disclosed or described . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103. Obviousness under Section 103 is shown by reviewing the scope

---

**3.** 35 U.S.C. § 102 provides:

A person shall be entitled to a patent unless—

(a) the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent, or

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States, or

(c) he has abandoned the invention, or

(d) the invention was first patented or caused to be patented by the applicant or his legal representatives or assigns in a foreign country prior to the date of the application for patent in this country on an application

filed more than twelve months before the filing of the application in the United States, or

(e) the invention was described in a patent granted on an application for patent by another filed in the United States before the invention thereof by the applicant for patent, or

(f) he did not himself invent the subject matter sought to be patented, or

(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. In determining priority of invention there shall be considered not only the respective dates of conception and reduction to practice of the invention, but also the reasonable diligence of one who was first to conceive and last to reduce to practice, from a time prior to conception by the other.

and content of the prior art, comparing the claims against the prior art, and by determining the level of ordinary skill in the art at the time of the invention. *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

Defendants urge that the patented subject matter was known and published prior to the time of the alleged invention and was therefore not novel within the meaning of Section 102. In addition, it is submitted by defendants that the plaintiff's patent was obvious within the meaning of Section 103. Analysis of the validity of a patent under these two sections parallel each other closely. As a result, because I find that the '282 patent is obvious, there will be no need to touch upon Section 102 in this decision.

### A. Inventor Estoppel

Before addressing the merits of defendants' motion, it is necessary to discuss plaintiff's argument that Feil is estopped from seeking to invalidate a patent which he applied for and then later assigned. Plaintiff argues that Feil received a handsome payment for assigning his '282 patent and should not now be permitted to disparage the invention in order to gain further profit.

The plaintiff's position relies upon the Supreme Court's decision in *Westinghouse Electric & Mfg. Co. v. Formica Insulation Co.*, 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316 (1924), wherein the Court declared:

> If one lawfully conveys to another a patented right to exclude the public from the making, using and vending of an invention, fair dealing should prevent him from derogating from the title he has assigned, just as it estops a grantor or a deed of land from impeaching the effect of his solemn act as against his grantee.

*Id.* at 350, 45 S.Ct. at 120. In a more recent decision, however, the Supreme Court ruled that the public interest behind the patent laws should preempt any estoppel doctrine grounded in the common law of contracts. In *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47 (1945), the Supreme Court rejected an estoppel argument and allowed an assignor to defend an infringement suit on the ground that the claims of the assigned patent were based on a prior patent that had expired. The Court reasoned that "the patent laws preclude us from saying that the patent assignment, which they authorize, operates to estop the assignor from asserting that which the patent laws prescribe, that the invention of an expired patent is dedicated to the public, of which the assignor is a member." *Id.* at 257, 66 S.Ct. at 105. The Supreme Court subsequently permitted a licensee of a patent to challenge its validity and reasserted the same overriding policies underlying the patent laws. *See Lear, Inc. v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). In addition, several lower courts have since permitted assignors of patents to challenge their validity. *See, e.g., Coastal Dynamics Corp. v. Symbolic Displays, Inc.*, 469 F.2d 79 (9th Cir. 1972); *Nationwide Chemical Corp. v. Wright*, 458 F.Supp. 828 (M.D.Fla.1976), *aff'd*, 584 F.2d 714 (5th Cir. 1978); *Brand Plastics Co. v. Dow Chemical Co.*, 267 F.Supp. 1010 (C.D. Cal.1967), *rev'd. in part on other grounds*, 475 F.2d 124 (9th Cir. 1973), *cert. denied*, 414 U.S. 1039, 94 S.Ct. 540, 38 L.Ed.2d 330 (1973).

In light of these precedents, I do not believe the circumstances of this case warrant estoppel of Feil's challenge to the '282 patent. The public has an interest in the validity of all outstanding patents, and scrutiny of the '282 patent by either the judiciary or the patent office should not be constrained by the contractual relationship between the parties. Accordingly, plaintiff's estoppel argument is rejected, and I now turn to an analysis of the obviousness of plaintiff's patent.

### B. Obviousness

Any inquiry into the obviousness of a patent must begin with a description of the patent's claims. The '282 patent is comprised of 49 claims which are set out in the margin in characteristically turgid pat-

entese.[4] The plaintiff, having not singled out any of these claims in its complaint, presumably alleges that all 49 have been infringed. The 49 claims describe a telephone communication system in which numerous telephone stations are connected over standard telephone lines, with each station having a set of pushbuttons for selecting a line for use. A console at each station contains two light displays: the first light display which appears on each pushbutton indicates the status of each telephone line; a second light display identifies, by means of an alphanumeric digital display, the particular telephone lines with which a specific station is communicating. Each console in this telephone system is called a trading turret. This name derives from the principal intended user of the system: a roomful of traders in such markets as commodity futures. In the words of the patent itself, the invention can best be appreciated

> in an environment where many people operate on similar business transactions in reasonably close proximity .... For instance, where commodity trading is occurring, and all traders are located within one room, each trader must have the capability of communicating over any telephone line. Further, each trader sometimes must know which other trader is on which other line, and each trader generally has to have an idea as to which line is free, so that when the trader decides to activate a telephone line, he can easily choose one that is not presently being utilized.

(Defendants' Exhibit A, Column 5, lines 30–45).

■■■■ The parties disagree with some of the meanings to be attached to many of the 49 claims. The contents of each claim, however, are crucial to the issues at bar. In analyzing these claims against the prior art, the proper scope of protection afforded a patent is defined by the language of the claims rather than by the invention's "title, specifications, exhibits or by the commercial embodiments of the claimed invention."

*MacLaren v. B–I–W Group, Inc.*, 535 F.2d 1367, 1372 (2d Cir. 1976), *cert. denied*, 429 U.S. 1001, 97 S.Ct. 531, 50 L.Ed.2d 612 (1976). The issue open for resolution "is not whether the prior art fully discloses the precise invention claimed, but rather whether, in light of this prior art, the claimed . . . invention would be obvious to one skilled in the art." *U. S. Philips v. National Micronetics, Inc.*, 410 F.Supp. 449, 458 (S.D.N.Y.1976), *aff'd.*, 550 F.2d 716 (2d Cir. 1977), *cert. denied*, 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 131 (1977).

### 1. The 49 Patent Claims

Claim 1 of the '282 patent describes the basic characteristics of the invention, namely, that it is a telephone system consisting of stations capable of being connected to numerous other stations via conventional telephone lines. Four characteristics of individual stations are included in claim one. First, the stations have a plurality of pairs of contacts with each pair connected by standard telephone lines. Second, the opening and closing of the pairs of contacts are controlled by a plurality of relay coils. Third, each station contains a plurality of sets of pushbuttons which are connected to corresponding pushbuttons at other stations. When pairs of pushbuttons are depressed, relay coils cause other depressed pushbuttons to be released and disconnected. Fourth, the stations have a dual light display. One light display is connected to a particular pushbutton to indicate the status of the corresponding line in use. The other light display identifies the particular line to which the station is connected.

Claim Two is dependent on Claim One and states simply that each pushbutton is a "non-locking depressible pushbutton." Claims Three, Four and Five are also dependent on Claim One and further describe the second light display feature. Claims Six, Seven, Eight and Nine describe the pushbutton and dual light display system and state that the switching and electrical devices all were contained in a "turret hous-

---

4. See Appendix.

ing" with cables running among a plurality of other similar turrets. Claim Ten parallels Claim One and specifically states that the light display identifies which of the other stations are in active communication. Claims Eleven, Twelve, Thirteen, Fourteen, Fifteen and Sixteen are dependent on Claim Ten and describe the turret's display which includes an alphanumeric symbol display consisting of a two-digit decimal base number. Claim Seventeen states that each turret display keeps track of the status of every telephone line in the system and is identical to the display shown on the other turrets in the system. Claim Eighteen states that each pushbutton has a code which provides the means to show on the displays of other turrets the status of the line corresponding to that pushbutton.

Claims Nineteen, Twenty and Twenty-One restate the turret display features, namely, the lighted pushbutton switches and the adjoining digital display, which identify the status of every telephone line in the system. Claim Twenty-Two repeats that the displays on each turret throughout the system operate simultaneously. Claims Twenty-Three and Twenty-Four are similar to Claim One and describe, in addition to the network of stations connected with each other on standard telephone lines, a master telephone station. According to these claims, each station in the system can establish a two-way telephone communication with any other station. The master station can similarly establish a two-way communication with any other station and also can listen in on a communication at any station. Each station, however, has the means to block any communication received from the master station. The blocking means, as described in Claim Twenty-Five, is connected to a receiver on each station and a shunt means connected across the receiver. Claim Twenty-Six is dependent on Claim Twenty-Four and explains that each station has a series of switches which connect via the various telephone lines other stations, including the master station.

Claim Twenty-Seven substantially reiterates Claim One and describes the entire system of stations containing the pushbut-ton switches and the location of each station's pushbuttons on the turrets. Each turret in the system, according to Claims Twenty-Eight, Twenty-Nine, Thirty and Thirty-One (each of which flow from Claim Twenty-Seven) contain identical displays for indicating the status of all the telephone lines in the entire system. Claims Thirty-Two and Thirty-Three speak of the driver means for showing the status of each line by means of a light display and a digital light display. Claims Thirty-Four and Thirty-Five explain that a given code permits simultaneous display at all stations of the status of each line, and each code is two-digit and unique for that line. Claims Thirty-Six, Thirty-Seven, Thirty-Eight and Thirty-Nine flow from Claim Twenty-Seven and repeat the claims that have previously been made. Claim Forty restates that the line status display uses lights. Claim Forty-One is similar to Claim One and along with Claim Forty-Two summarizes the system and the master stations. In addition to having the same display that each station has, these master stations have a request signal display and a signal connected to each station in the system so that any station can contact the master station.

Claims Forty-Three and Forty-Four further describe the signal from a station to the master station and also state that the master station can connect to the requesting station. Claim Forty-Five explains that a station in two-way communication with another station can send a request signal to the master station enabling the master station to communicate with the signalling station, and at the same time the signalling station can prevent the other station from hearing the communication between it and the master station.

Claim Forty-Six is similar to Claim Seven and describes individual turrets with non-locking pushbutton switches and dual light displays. We are reminded in Claim Forty-Seven that the turrets hook up to telephone lines and that the switching means are remotely located from the turret.

Claim Forty-Eight is similar to Claim One and states that the system consists of standard telephone lines and that the pushbuttons control the switching between lines. The switching itself is effected at a location remote from the turrets and their pushbuttons. This claim also states the display means for identifying which of the telephone stations are in active communication.

Claim Forty-Nine is also similar to Claim One and provides a summary of all the claims regarding the system.

## 2. The Prior Art

In prosecuting the '282 patent, the U. S. Patent Office made of record nine prior U. S. patents and two publications.[5] Among the prior patents were (i) a telephone line selection system including a telephone unit with pushbutton line selection switches for operating relay circuits located in a remote control box connecting the telephone terminals with selected telephone lines (U.S. Patent No. 3,757,056 to Faulkes) ("the Faulkes Patent"); (ii) a plural line selector apparatus for enabling selection of one of a plurality of telephone lines (U. S. Patent No. 3,931,481 to Jackson) ("the Jackson Patent"); (iii) two patents which disclose the concept of providing a digital display of the calling number or the identification number of the line on which an incoming call is received (U. S. Patent No. 3,727,033 to Paraskerakos) ("the Paraskerakos Patent"), (U. S. Patent No. 3,928,732 to Simon and Torrey) ("the Simon and Torrey Patent"); (iv) telephone stations with non-locking buttons, relay coils and relays contacts (U. S. Patent No. 3,150,238 to Carter) ("the Carter Patent"); (v) telephone switching system with a master station (U. S. Patent No. 3,819,871 to Verdon) ("the Verdon Patent").

Two relevant pieces of prior art were overlooked by the Examiner: the Ozenberger Article and the Keith Article. The significance of these articles is disputed by the parties.

In the Keith Article, a system known as the 310 Switching System, developed by the Bell Laboratories, is described. This system is controlled from any one of up to eight attendant or dispatcher consoles which are available for either forty or one hundred station lines. The 310 Switching System employs two separate sets of display lamps for indicating the status of telephone lines in use. One set of lamps is located behind each line key as in conventional key telephones and indicates the status of any line in the system, while a second set of lamps is located adjacent to these line keys for indicating or identifying the line connected to the particular key. The Keith Article describes this dual light display system as follows:

The dispatcher's console contains pushbutton line keys, arranged in vertical rows of ten, which provide immediate access to any line in the system. A lamp behind each line key serves as a line status indicator. It flashes rapidly (one-second intervals) for an incoming call, flashes slowly (two-second intervals) while waiting for the distant end to answer, and if the line is equipped for supervision, stays lighted when the line is busy, and "winks" when the line has been placed on hold. Each line key lamp signal is connected to every console in the system having access to the line.

A second lamp, located under a translucent cover adjacent to each key, identifies the lines associated with a particular attendant conference or connection. (Keith Article at pp. 118–19)

Not only was the Keith Article not before the Examiner at the time of the prosecution of the '282 patent but it also was not made part of the plaintiff's recent application to the patent office to discount any prior art not previously considered.

The 310 console is similar to another Bell Laboratories system described in the Ozenberger Article and named the 300 Switching System. The 300 Switching System is a

5. The record before me does not disclose the names of the two publications contained in the Patent Office's record. It is certain, however, that they were neither the Ozenberger Article nor the Keith Article.

non-locking key telephone system developed by Bell Laboratories in which two different types of light displays are associated with the non-locking keys for the purpose of indicating the status of the lines in use. The keys provide indirect access to a particular telephone line: a caller "presses [a] key, dials a two or three digit code . . . , and in this way connects to any line or other controller in the [system]." (Ozenberger Article at p. 157) The system may also provide for direct access. The use of non-locking keys as opposed to mechanical locking keys in the 310 system requires some type of light status display. The Ozenberger Article describes a lamp which flutters at varying frequencies to indicate the line status.

### 3. Comparison of the '282 Patent Claims to Prior Art

It is urged by defendants that these articles, in conjunction with the switching systems patented by Bell Laboratories, disclosed and made obvious the claims made in the '282 patent. The defendants argue that the invention was known at the time of its issuance within the meaning of 35 U.S.C. § 102 and was obvious under 35 U.S.C. § 103.

■ The grant of a patent raises a presumption of its validity for the reason that the United States Patent Office has experienced personnel uniquely qualified to determine whether an invention is useful, Section 101, novel, Section 102, and non-obvious, Section 103. *See* 35 U.S.C. § 282 (1976). This presumption, however, is subject to judicial review and may be overcome if it can be shown that the Examiner overlooked pertinent prior art. *Janex Corp. v. Bradley Time*, 460 F.Supp. 383 (S.D.N.Y. 1978).

The Keith and Ozenberger Articles, the nine prior patents and the two articles disclosed to the Patent Office define the prior art against which the '282 patent claims must be compared. As earlier stated, the question is not whether this prior art fully discloses the precise invention claimed, but rather whether, in light of this prior art, the claimed invention, taken as a whole, would be obvious to one skilled in the art.

The plaintiff has submitted the affidavit of an engineer, Herbert Goldwag, which analyzes the individual claims of the '282 patent and compares them with the Keith and Ozenberger Articles. It is Mr. Goldwag's conclusion that "there are significant differences with respect to the structure disclosed in the patent corresponding to the various elements of the claims when compared to the Ozenberger and Keith Articles. Based on my experience, I do not feel that information in the articles teach or suggest the combinations specifically defined by these claims." Goldwag Affidavit ¶ 57.

■ A review of the essence of the '282 patent's claims, which plaintiff argues are totally unique despite the newly discovered articles, reveals, however, that the claims would have been obvious to anyone skilled in the art. The record before me makes clear that if specific features of the invention were not revealed by either the Keith or the Ozenberger Articles, they were disclosed by the prior patented inventions. A look at six principal features which plaintiff argues are not obvious demonstrate that there are indeed no material questions of fact regarding the obviousness of plaintiff's invention and dictate summary judgment. First, the '282 patent relies upon "pairs of contacts" and "relay coils" at each telephone station to allow telephone communication over a desired standard telephone line. (See primarily Claim Seven). This feature is not disclosed in either the Keith Article or the Ozenberger Article which both rely chiefly on cross bar switches, rather than individual relays, to provide communication with desired telephone lines at the console stations. Two existing patents, the Faulkes Patent and the Carter Patent (Defendants' Exhibit H), however, do disclose telephone stations with non-locking buttons, relay coils and pairs of contacts.

Second, the plaintiff points to the claims reciting the "pushbutton switch means" which, according to the plaintiff, "relates to circuits including non-locking pushbutton switches, at each telephone station for controlling telephone communication between the telephone station and a particular telephone line, a memory function for remembering which of the pushbuttons has been actuated as well as a logic function for determining when a particular telephone communication is or is not to be released." (Plaintiff's Rule 3(g) Statement ¶ 3a). The Ozenberger Article clearly refers to non-locking pushbutton keys which provide access to telephone lines between stations. (Ozenberger Article at pp. 156–57). The Keith Article also describes pushbutton line keys, "which provide immediate access to any line in the system." (Keith Article at p. 118). Moreover, the Faulkes Patent shows telephone units having pushbutton line selection switches for operating relay circuits to connect terminals with selected telephone lines.

Third, plaintiff asserts that the '282 patent claims of a "display means," to wit, a light display coupled to the set of non-locking pushbuttons for indicating the status of each telephone line, is unique. Plaintiff further asserts that the alphanumeric, two-digit decimal display, which provides a second light display to show the active line connections, achieved by way of a coder, is also unique. In fact, although the Ozenberger Article describes a light display that uses only a single lamp, the Keith Article clearly introduces a second, separate set of display lamps to indicate the line in use. Moreover, as far as the digital display is concerned, this feature was included in the Paraskerakos Patent and the Simon and Torrey Patent. These two patents disclose a mechanism for either digital displays of the calling number or the identification of the line number on which an incoming call is received.

Fourth, the plaintiff mentions as a distinguishing feature of the '282 patent the "co-der means" which relate to a coder in the form of a diode matrix. This coder activates the light display. In fact, the Paraskerakos Patent mentions a decoding device for the display of active telephone lines. In addition, the diode matrix was no mystery to one engineer, Thomas Fitzmaurice, who examined the plaintiff's system. In deposition testimony, he stated:

Q. Mr. Fitzmaurice, how did you know that the system had a diode matrix in it?

A. By considering the problem, you had a field of keys on one end and you had a seven-segment display on the other end, and the means of causing the display to light in accordance with the key you pushed was something that even at that time was in the electronics for junior high school students [books]. It was just a common thing.

Fitzmaurice Deposition, pp. 20–21.

Fifth, the plaintiff argues that no prior art discloses the '282 patents' ability to identify both the particular telephone line to which a station is connected and also which of the other telephone stations are in active communication. In fact, however, the Keith Articles' dual lamp display system does just that.

Sixth, the plaintiff urges that the '282 patent is unique because of its master station hook up. It is specifically asserted that the Keith and Ozenberger Articles fail to disclose an ability of individual stations to signal a master station and a blocking means whereby a station can communicate with another station and the master station and any communication to the master station is blocked off from the other stations. The Ozenberger Article, however, does disclose the following feature:

Each controller has a key which permits him to switch his incoming override channel either to his telephone set or to his loudspeaker. In addition to using override to converse with controllers, a supervisor or controller may use it to monitor another controller for the purpose of lending assistance or training.

(Ozenberger Article, p. 158) Another piece of prior art, the Verdon Patent also discloses a telephone switching system with a master station.

Thus, it appears that the '282 patent, when taken as a whole, would have been obvious at the time of the invention to a person having ordinary skill in the pertinent art. Aside from its arguments addressing the technical features of the patent, plaintiff further disputes this conclusion of obviousness to persons skilled in the art by presenting the deposition testimony of John J. Fitzmaurice, a New York Telephone Company engineer. In 1975, Mr. Fitzmaurice visited the Republic National Bank in New York to examine the plaintiff's equipment which had been installed at the Bank and which embodied the invention of the '282 patent. Mr. Fitzmaurice indicated that the plaintiff was making inroads into the telephone systems market with the '282 patent. In fact, these inroads subsequently prompted New York Telephone to work on designing a new system to compete with the plaintiff's system. From these facts, plaintiff urges the conclusion that the '282 patent was not obvious to a skilled telephone engineer. Mr. Fitzmaurice's comments reveal that the plaintiff's invention was easily understood at first glance. Mr. Fitzmaurice responded to this issue as follows:

> Q. Just in summarizing, it is correct to state that you believe, based on your own prior experience as of the time you observed this system, that there was nothing about this system that you thought you did not understand in terms of how it operated?
>
> \* \* \* \* \* \*

**6.** The PDP–8 was a computer added to the plaintiff's system. It does not form any part of the claims in the contested patent and appar-

> A. To restate, with the exception of the funny PDP–8 [6] I did understand the operation of the system.
>
> Q. Completely?
>
> A. Yes.
>
> Q. And that understanding was based on your prior experience and knowledge in the telephone industry?
>
> A. Yes.

(Fitzmaurice Deposition at pp. 20–21)

Plaintiff further argues that the commercial success of its product and the distinct niche it occupies in the marketplace militates against a finding of obviousness. In light of my finding of the obviousness of the patented invention, as it is described in the claims of the '282 patent, these secondary considerations cannot be afforded any weight. *See Great A & P Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950); *Digitronics Corp. v. New York Racing Assn.*, 553 F.2d 740, 748 (2d Cir. 1977), *cert. denied*, 434 U.S. 860, 98 S.Ct. 187, 54 L.Ed.2d 133 (1977). Similarly, Mr. Feil's purported failure to bring the Ozenberger Article to the attention of the patent office prior to 1980 is of no consequence here.

In view of the clear showing that the '282 patent was exposed by the prior art in the area, summary judgment is appropriate under the circumstances. *See Janex Corp. v. Bradley Time*, 460 F.Supp. 383 (S.D.N.Y. 1978). Defendants' motion for summary judgment on Count I of the complaint is granted. Because of my previous dismissal of Count Two of the complaint, the entire complaint is now dismissed.

SO ORDERED.

ently was included in the system in an effort to mislead would be competitors.

APPENDIX

3,991,282

I claim:

1. For a telephone system in which telephone communication is capable of being established for each telephone station of a plurality of telephone stations over a standard telephone line by directly connecting each telephone station to a selected standard telephone line of a plurality of standard telephone lines, each of said plurality of standard telephone lines capable of being directly connected to each of said plurality of telephone stations, an improvement comprising:

a plurality of pairs of contacts, with respective pairs of said contacts being connected with respective ones of said standard telephone lines for allowing said communication;

a plurality of relay coils, with respective ones of said relay coils controlling respective pairs of said contacts to be opened or closed;

a plurality of sets of pushbutton switch means with each set of pushbutton switch means connected to respective ones of said telephone stations with respective ones of said pushbutton switch means of said sets of pushbutton switch means corresponding to respective ones of said standard telephone lines and being connected with a respective ones of said relay coils and being depressed for energizing a selected one of said relay coils for closing a corresponding pair of contacts to allow said telephone communication; and each of said stations comprising first light display means, connection means connecting corresponding pushbuttons of said sets of pushbutton switch means in each of said stations and to said first light display of means for energizing said first light display means in each station to display the status of each of said plurality of standard telephone lines in each of said stations, said station further comprising second light display means connected to said pushbutton switch means for identifying the standard telephone line that the telephone station is using for said telephone communication.

2. A system as set forth in claim 1, wherein each of said pushbutton switch means comprises a non-locking depressible pushbutton.

3. A system as set forth in claim 1, further comprising coder means connected between each pushbutton switch means of each set of said pushbutton means and said light display means at each station for generating a unique electrical signal corresponding to the selected pushbutton switch means depressed.

4. A system as set forth in claim 1, wherein said second light display means comprises a display area and means connected to said pushbutton switch means for producing a numeral on said display area indicating the standard telephone line which is in active communication.

5. A system as set forth in claim 4, further comprising coder means connected to said pushbutton switch means for generating a unique electrical signal corresponding to the selected pushbutton switch means depressed, the output of said coder means being connected to said second light display means.

6. A system as set forth in claim 1, comprising a turret housing a respective set of said plurality of sets of said pushbutton means and said first and second display means said plurality of pairs of contacts and said plurality of relay coils being located remotely from said turret and electrical cable means connecting said turret to said plurality of relay coils for carrying electrical signals to control said relay coils.

7. A turret located at each telephone station of a plurality of telephone stations for use with a switching system, said switching system establishing telephone communication for each telephone station over a standard telephone line by directly connecting each telephone station to a selected standard telephone line of a plurality of standard telephone lines, said switching system comprising a plurality of pairs of contacts being connected with respective ones of said standard telephone lines for allowing said communication; and a plurality of relay coils, with respective ones of said relay coils controlling respective pairs of said contacts to be opened or closed;

said turret comprising

a plurality of pushbutton switch means for producing an electrical control signal with respective ones of said pushbutton switch means being connected with a respective one of said relay coils for energizing a selected one of said relay coils for closing a corresponding contact pair to allow said telephone communication along said selected telephone line,

panel means for mounting said plurality of pushbutton switch means, and

first light display means, connection means connected between corresponding pushbutton switch means in each of said turrets and said first light display means for displaying in each turret the status of each of said plurality of standard telephone lines, said turret further comprising second light display means connected to said pushbutton switch means for identifying the standard telephone line that the telephone station is using during said telephone communication.

8. A turret as set forth in claim 7, wherein said turret further comprises a telephone line

panel area for housing said pushbutton switch means and said first light display means, a display panel area for housing said second light display means, and a functional panel are for housing functional pushbutton switch means, all of said panel areas being formed in the same plane.

9. A turret as set forth in claim 7, wherein said plurality of standard telephone lines, said plurality of pairs of contacts and said plurality of relay coils are remotely located from said turret, further comprising cable means connected between said turret and said relay coils for controlling the closing of selected pairs of contacts.

10. In combination

a plurality of telephone stations;

a plurality of standard telephone lines each being connectable to each of said plurality of telephone stations;

a plurality of pairs of contacts, with respective pairs of said contacts being connected with respective ones of said standard telephone lines for allowing telephone communication with said telephone stations;

a plurality of relay coils, with respective ones of said relay coils controlling respective pairs of said contacts to be opened or closed; and

each of said stations comprising a plurality of pushbutton switch means for producing electrical control signals, with each of said pushbutton switch means being connected with a respective one of said relay coils for energizing a selected one of said relay coils for closing a selected contact pair to allow telephone communication along a selected standard telephone line of said plurality of standard telephone lines;

each of said telephone stations comprising display means connected to said pushbutton switch means in each of said telephone stations for identifying which of said other telephone stations are in active telephone communication.

11. A system as set forth in claim 10, wherein each of said stations comprises a turret, each of said turrets comprising a panel for said plurality of pushbuttons at said station, said panel further comprising a display panel area for said display means.

12. A system as set forth in claim 11, wherein said display panel area comprises a plurality of turret display areas, each of said turret display areas corresponding to a respective one of said turrets.

13. A system as set forth in claim 12, wherein said plurality of turret display areas comprises a plurality of windows, each of said window locations corresponding to a respective one of said turrets.

14. A system as set forth in claim 12, wherein each of said turret display areas comprises means for displaying the telephone line of said plurality of standard telephone lines to which each of said respective turrets is actively connected.

15. A system as set forth in claim 14, wherein each of said turrets comprises driver means for driving said display means, each of said driver means being controlled by a respective one of said stations to display in each station the status of all other stations, said driver means controlling said display means to produce an alphanumeric symbol representing the telephone line of said plurality of standard telephone lines to which said respective turret is actively connected.

16. A system as set forth in claim 15, wherein said alphanumeric symbol comprises a two-digit decimal base number.

17. A system as set forth in claim 16, wherein each station comprises code means connected to respective driver means located in each of said plurality of stations, said code means driving said driver means at each of said stations to simultaneously display at all stations the telephone line of said plurality of standard telephone lines to which said respective turret is actively connected.

18. A system as set forth in claim 17, wherein said code means comprises a coder, said coder connected to said plurality of pushbutton switch means to produce a two-digit unique code to drive said driver means at each of said stations, said unique code representative of the specific pushbutton switch means and corresponding telephone line selected.

19. A system as set forth in claim 10, wherein said display means identifies the telephone line of said plurality of standard telephone lines to which each of said other stations is actively connected.

20. A system as set forth in claim 19, wherein each of said stations comprises a plurality of drive means connected to said pushbutton switch means for driving said display means, each of said driver means being controlled by a respective one of said stations to display in each station the status of said respective one of said stations, said drive means controlling said display means to produce an alphanumeric symbol representing the telephone line of said plurality of standard telephone lines to which each of said respective stations is actively connected.

21. A system as set forth in claim 20, wherein said alphanumeric symbol comprises a two-digit decimal base number.

22. A system as set forth in claim 21, wherein each station comprises coder means having a plurality of inputs, with each of said inputs connected to a respective one of said plurality of pushbutton switch means and output means connected to each of said plurality of stations, said coder means driving said driver means at each of said stations to simultaneously display at all stations the telephone line of said plurality of standard telephone lines to which each of said stations is actively connected.

APPENDIX—Continued

23. For use with a plurality of standard telephone lines and a plurality of telephone stations;

a master telephone station;

each of said plurality of standard telephone lines connectable to each of said plurality of telephone stations and to said master telephone station;

a plurality of pairs of contacts, with respective pairs of said contacts being connected with respective ones of said standard telephone lines for allowing telephone communication with all of said telephone stations;

a plurality of relay coils, with respective ones of said relay coils controlling respective pairs of said contacts to be opened or closed;

each of said telephone stations and said master station comprising a plurality of pushbutton switch means for producing an electrical control signal with each of said pushbutton switch means being connected with a respective one of said relay coils for energizing a selected one of said relay coils for closing a selected contact pair to allow telephone communication along a selected telephone line of said standard telephone lines;

said master station comprising a plurality of display means with respective ones of said plurality of said display means connected to respective ones of said telephone stations for identifying which of said telephone stations are in active telephone communication; and

signaling means connected to each of said telephone stations for providing a request signal displayed on respective display means at said master telephone station.

24. For a telephone system in which telephone communication is capable of being established for each telephone station of a plurality of telephone stations over a standard telephone line by directly connecting each telephone station to a selected standard telephone line of a plurality of standard telephone lines, an improvement comprising

each of said telephone stations comprising a network being capable of establishing two-way telephone communication through said network over said standard telephone line;

a master telephone station; said master station comprising an additional network connectable to each of said plurality of telephone stations enabling said master station to have two-way communication with any of said plurality of telephone stations, said master station being connected to hear the communication at any of said telephone stations;

each of said telephone stations comprising blocking means to block the communication received from said master station from being transmitted to said standard telephone line.

25. The system of claim 24, wherein each of said plurality of telephone stations comprises a transmitter and a receiver, said blocking means being connected to said receiver, and shunt means connected across said receiver, said shunt means normally being operative permitting standard two-way telephone communication through said network at said telephone station over said standard telephone lines.

26. The system of claim 24, wherein each of said telephone stations comprise a request switch being closed to connect said additional network to a respective telephone station, said master station comprising an answer switch being closed to connect said master station to said additional network.

27. In combination

a plurality of telephone stations;

a plurality of standard telephone lines being connectable to each of said plurality of telephone stations;

switching means for selectively directly connecting each telephone station to any one of said plurality of telephone lines to permit said communication;

each telephone station comprising a respective plurality of pushbutton switch means connected to said switching means, each of said respective pushbutton means operating said switching means to connect a corresponding selected telephone line to the corresponding telephone station for active communication; and

each of said stations comprising display means connected to said pushbutton switch means in each of said telephone stations for identifying which of the other stations are in active telephone communication.

28. A system as set forth in claim 22, wherein each of said stations comprises a turret comprising said respective plurality of pushbutton switch means, each of said turrets comprising panel means including a panel for said respective plurality of pushbuttons, said panel means further comprising a display panel area for said display means.

29. A system as set forth in claim 28, wherein said display panel area comprises a plurality of turret display areas, each of said turret display areas corresponding to a respective one of said turrets.

30. A system as set forth in claim 29, wherein said plurality of turret display areas comprises a plurality of windows, each of said window locations corresponding to a respective one of said turrets.

31. A system as set forth in claim 29, wherein each of said turret display areas comprises means for displaying the telephone line of said plurality of standard telephone lines to which each of said respective turrets is actively connected.

32. A system as set forth in claim 31, wherein each of said stations comprises driver

means for driving said display means, each of said driver means being controlled by a respective one of said stations to display in each station the status of said respective one of said stations, said driver means controlling said display means to produce an alphanumeric symbol representing the telephone line of said plurality of standard telephone lines to which said respective station is actively connected.

33. A system as set forth in claim 32, wherein said alphanumeric symbol comprises a two-digit decimal base number.

34. A system as set forth in claim 33, wherein each station comprises code means connected to respective drivers in each of said plurality of stations, said code means driving said driver means at each of said stations to simultaneously display at all stations the telephone line of said plurality of standard telephone lines to which said respective turret is actively connected.

35. A system as set forth in claim 34, wherein said code means comprises a coder, said coder connected to said plurality of pushbutton switch means to produce a two-digit unique code to drive said driver means at each of said stations, said unique code representative of the specific pushbutton switch means and corresponding standard telephone line selected.

36. A system as set forth in claim 27, wherein said display means identifies the telephone line of said plurality of standard telephone lines to which each of said respective stations is actively connected.

37. A system as set forth in claim 36, wherein each of said stations comprises driver means connected to said pushbutton switch means for driving said display means, each of said driver means being controlled by a respective one of said stations to display in each station the status of said respective one of said stations, said driver means controlling said display means to produce an alphanumeric symbol representing the telephone line of said plurality of standard telephone lines to which said stations are actively connected.

38. A system as set forth in claim 37, wherein said alphanumeric symbol comprises a two-digit decimal base number.

39. A system as set forth in claim 38, wherein each station comprises coder means having a plurality of imputs with each of said plurality of inputs connected to a respective one of said plurality of respective pushbutton switch means and output means connected to each of said plurality of stations, said coder means driving said driver means at each of said stations to simultaneously display at all stations the telephone line of said plurality of standard telephone lines to which said station is actively connected.

40. A system as set forth in claim 27, wherein said display means comprises light generation means for identifying which of said telephone stations is in active communication.

41. For use with a plurality of standard telephone lines,

a plurality of telephone stations;

a master telephone station;

each of said plurality of standard telephone lines connectable to each of said plurality of stations and to said master telephone station;

switching means for selectively directly connecting each telephone station to any of said plurality of telephone lines to permit said communication;

each of said stations and said master station comprising a respective plurality of pushbutton switch means connected to said switching means, each of said respective pushbutton means operating said switching means to connect a corresponding selected telephone line to the corresponding telephone station for active communication;

said master station comprising display means connected to said pushbutton switch means in each of said stations for identifying which of said other stations is actively connected to any of said standard telephone lines; and

signaling means connected to each of said stations for providing a request signal displayed at said master station.

42. A system as set forth in claim 41, wherein said display means of said master station comprises separate display areas corresponding to each of said stations, said request signal being displayed in said display area corresponding to said station providing said request.

43. A system as set forth in claim 42, wherein said display means comprises means to display a representative code corresponding to the active telephone line to which each of said stations is actively connected, said station providing said request producing a signal to periodically turn the displayed code on and off for signaling the request.

44. A system as set forth in claim 43, wherein said master station comprises means for establishing a connection between said master station and the station providing the request signal.

45. A system as set forth in claim 44, wherein the operator at said station providing the request signal is in telephone two-way communication over a standard telephone line with another operator at another telephone location, said master station comprising means connected to said station providing the request signal to establish connection to said two-way communication, said station providing the request signal comprising switching means for enabling said master station to communicate directly with said station providing the request signal and blocking means to prevent the operator at said other location from hearing the communication between said master station and said station providing the request signal.

## APPENDIX—Continued

**46.** A turret located at each telephone station of a plurality of telephone stations for use with a switching system, said switching system establishing telephone communication for a telephone station over each standard telephone line by directly connecting each telephone station to a selected standard telephone line of a plurality of standard telephone lines, said switching system comprising switching means for selectively directly connecting each telephone station to any one of said plurality of standard telephone lines to permit said communication;

    said turret comprising

    a plurality of non-locking pushbutton switch means connected to said switching means, each of said non-locking pushbutton means operating said switching means to connect a corresponding selected standard telephone line to the telephone station corresponding to said turret for active communication;

    panel means for mounting said plurality of pushbutton switch means,

    first light display means, connection means connected between corresponding pushbutton switch means in each of said turrets and said first light display means for displaying the status of each of said plurality of standard telephone lines, said turret further comprising second light display means connected to said non-locking pushbutton switch means for identifying the standard telephone line that the telephone station is using during said telephone communication.

**47.** A turret as set forth in claim **46**, wherein said plurality of standard telephone lines, said plurality of pairs of contacts and said switching means are remotely located from said turret, further comprising cable means connected between said turret and said switching means.

**48.** For a telephone system in which telephone communication is established for each telephone station of a plurality of telephone stations over a standard telephone line by directly connecting each telephone station to a selected standard telephone line of a plurality of standard telephone lines, each of said plurality of standard telephone lines capable of being directly connected to each of said plurality of telephone stations, an improvement comprising

    switching means for selectively directly connecting said one telephone station to any one of said plurality of standard telephone lines to permit said communication;

    each of said telephone stations comprising a plurality of pushbutton switch means connected to said switching means, each of said pushbutton means operating said switching means to connect a corresponding selected telephone line to said one station for active communication;

    said plurality of standard telephone lines and said switching means being remotely located from said plurality of stations;

    each of said telephone stations comprising display means connected to said pushbutton switch means in all of said telephone stations for identifying which of said separate telephone lines is connected with which of said stations for active communication; and

    electrical cable means connected between each of said stations and said switching means.

**49.** For a telephone system in which each telephone station of a plurality of telephone stations can communicate over a standard telephone line by directly connecting each telephone station to a selected standard telephone line of a plurality of standard telephone lines, each of said plurality of standard telephone lines capable of being directly connected to each of said plurality of telephone stations, an improvement comprising,

    switching means for selectively directly connecting each telephone station to any one of said plurality of telephone lines to permit said communication;

    each of said stations comprising a plurality of non-locking pushbutton switch means connected to said switching means to connect a corresponding selected telephone line to each of said stations, for active communication;

    each of said stations comprising first light display means, connection means for connecting corresponding ones of said pushbutton switch means in each of said stations to said first light display means for displaying the status of each of said plurality of standard telephone lines and second light display means connected to said non-locking pushbuttons for identifying which telephone line the station is using for active telephone communication.