SIMMONS FASTENER CORPORATION,
Plaintiff,

v.

ILLINOIS TOOL WORKS, INC.,
Defendant.

No. 80–CV–468.

United States District Court,
N.D. New York.

April 4, 1983.

Kohn, Bookstein & Karp, Albany, N.Y., Wyatt, Gerber, Shoup, Scobey, Eliott, Gerber & Badie, New York City, for plaintiff; Richard A. Kohn, Albany, N.Y., of counsel.

Bouck, Holloway & Kiernan, Albany, N.Y., Cook, Wetzel & Egan, Chicago, Ill., for defendant; Granger Cook, Jr., Chicago, Ill., of counsel.

**1278**

McCURN, District Judge.

## MEMORANDUM–DECISION & ORDER

The plaintiff, Simmons Fastener Corporation ("Simmons"), brought this action against defendant Illinois Tool Works ("ITW"), for a judgment declaring that United States Patent No. 3,802,476, entitled "Screw Anchor", and naming James E. Hoadley as its inventor, ("the Hoadley Patent") is invalid, not infringed, and not enforceable against Simmons. ITW, the owner of the patent by virtue of an assignment from Hoadley, has counterclaimed, charging Simmons with wilful infringement. Jurisdiction of the Court is based on 28 U.S.C. Sec. 1338 relating to patent suits and 28 U.S.C. Sec. 2201 authorizing declaratory judgments; venue is proper under 28 U.S.C. Sec. 1400.

A non-jury trial on the issue of liability only was held before this Court from January 18–21, 1983, with summation by the parties on February 3, 1983.[1] This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Fed.R.Civ.P.

## I. Background

Both Simmons and ITW manufacture and distribute fasteners for industrial use. The Hoadley patent covers a fastener with particular application in the refrigerator industry. During the mid to late 1960's, manufacturers began to convert from refrigerators made with a steel inner liner and fiberglass insulation between the liner and the steel outer shell, to a thin flexible plastic liner, and foamed-in-place insulation between the liner and the shell. The new plastic liners, though advantageous in many ways, confronted manufacturers with difficulties in installing shelves and other hardware in the refrigerator cabinet. The liners were fragile and subject to cracking, and tended to be of uneven thickness. Moreover, holes made in the liner for the reception of fasteners would, if left exposed during the foaming process, result in seepage of insulation into the cabinet. The foaming process involved the injection of liquid polyurethane into the space between the steel outer shell and the plastic inner liner; that substance then expanded to fill the entire space between the shell and liner, insulating the refrigerator interior. Any seepage of foam through the liner during this process tended to disrupt production and damage the cabinet.

The Hoadley invention is one of many products which was devised in response to the fastening problems expressed by refrigerator manufacturers.[2] More fully described elsewhere in this opinion, it is in typical embodiment a small metal plate (the exhibit offered to the Court is approximately 1 inch by ¾ inch in size) with a centrally located helical screw impression (App. A Fig. 1 # 14) and "wings", or bent plate edges (Fig. 2 # 12a). The plate is located to its proper position on the insulation side of a refrigerator liner by two upstanding "tabs" (Fig. 4 # 16). Once positioned, it adheres to the liner by the use of an adhesive pad, typically double-sided tape, on its face (Fig. 1 # 20). The tape not only enables the device to stick to the liner, it also seals the aperture in the liner, preventing insulating foam from seeping through to the cabinet. The device will anchor a screw, which is installed from the refrigerator cabinet through the liner and into the helical screw impression (Fig. 5). The screw can then be used to attach shelves and other hardware to the refrigerator cabinet.

Simmons presently manufactures a virtually identical device, which it calls an "adherable nut plate". This nut plate is the subject of the ITW counterclaim of patent infringement. Simmons bases its right to manufacture that product on three grounds: (1) the Hoadley patent is invalid because its subject matter does not meet the statutory requirement of non-obviousness. 35 U.S.C. Sec. 103; (2) the Hoadley patent is not infringed by the Simmons product because the patent claims a plate

1. By agreement of the parties and with permission of the Court, those issues relating to damages have been held in abeyance pending the determination of liability.

2. A diagram of the Hoadley screw anchor appears in Appendix A to this decision.

with two tabs "at opposite sides of" the screw impression, while the accused Simmons nut plate has three tabs situated around the screw impression which are not diametrically opposite one another; (3) the Hoadley patent is not enforceable due to the failure of ITW to fully ·and accurately disclose the prior art, to the Patent Office during the prosecution of the patent, and due to various acts of patent misuse by ITW.

Because the Court has determined that the Hoadley patent is invalid as obvious under 35 U.S.C. Sec. 103, the issues of infringement and enforceability are not reached.

## II. *Nonobviousness Standard*

In order to limit the availability of the patent monopoly to "those inventions which would not be disclosed or devised but for the inducement of a patent", *Graham v. John Deere Co.,* 383 U.S. 1 at 11, 86 S.Ct. 684 at 690, 15 L.Ed.2d 545 (1966), Congress imposed three explicit conditions on patentability: utility, 35 U.S.C. Sec. 101; novelty, 35 U.S.C. Sec. 102; and nonobviousness, 35 U.S.C. Sec. 103. Simmons concedes that the patented screw anchor is both useful and novel, but insists that the device would have been obvious to one having ordinary skill in the appliance fastener art. Section 103 states, in pertinent part:

A patent may not be obtained . . . if the differences between the subject matter

sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

In *Graham v. John Deere, supra,* the Supreme Court established the following guidelines for determining obviousness:

Under Sec. 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained and the level of ordinary skill in the pertinent · art resolved. Against this background the obviousness of the subject matter· is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. · As indicia of obviousness, these inquiries · may have relevancy.

*Id.,* 383 U.S. at 17–18, 86 S.Ct. at 694.

■ It is essential in conducting this analysis that the Court avoid hindsight, and not "succumb to the tendency of regarding virtually any improvement as 'obvious' in light of the modern, updated art." *Maclaren v. B–I–W Group, Inc.,* 535 F.2d 1367, 1375 (2d Cir.1976); *Karch v. United States,* 568 F.2d 722, 726 (Ct.Cl.1977).[3] At the

---

**3.** Some question has arisen as to the source of case-law which this Court must follow, due to the recent creation of a United States Court of Appeals for the Federal Circuit, which will hear, *inter alia,* appeals from district court orders in patent cases. 28 U.S.C. § 1295(a)(1) (1982). At the outset of its first decision, *South Corp. v. United States,* 690 F.2d 1368 (October 28, 1982), the Court made the following statement:

The Court sits *en banc* to consider what case-law, if any, may appropriately serve as established precedent. We hold that the holdings of our predecessor courts, the United States Court of Claims and the United States Court of Customs and Patent Appeals announced by those courts before the close of business September 30, 1982, shall be binding as precedent in this Court.

*Id.* at 1369.

The parties and the Court acknowledge, as they must, that decisions of the USCAFC are

controlling here, as, of course, are decisions of the United States Supreme Court. The controversy, however, is over the relative weight to accord decisions of the Court of Appeals for the Second Circuit as compared to decisions of the Court of Claims and Court of Customs and Patent Appeals, which are now followed by the USCAFC.

We are of the view that we may properly look to the decisions of each of these courts for illumination of the issues in this case. Nothing in the Federal Courts Improvement Act of 1982, Pub.L.No. 97–164, 96 Stat. 25, or in *South Corp., supra,* instructs this Court to disregard the heretofore binding case-law of the Second Circuit. Although a need to establish precedential priorities would arise were there to be a clear conflict between the decisions of the Second Circuit and the former specialized courts, no such conflict presents itself in this case.

same time, the Court does not need to ponder whether the subject matter was obvious to the inventor himself, in light of his actual knowledge of the prior art; our inquiry is directed to whether the subject matter would have been obvious to "the hypothetical person of ordinary skill in the art [who] is presumed to have knowledge of all prior art in his field of endeavor."[4] *Pevar v. United States,* 215 U.S.P.Q. 265, 277 (Ct.Cl. 1982); *Application of Wood,* 599 F.2d 1032, 1036 (Cust.Pat.App.1979); *Lockheed Aircraft Corp. v. United States,* 553 F.2d 69, 83, 213 Ct.Cl. 395 (Ct.Cl.1977); *Maclaren v. B–I–W Group, Inc., supra,* 535 F.2d at 1378; *Application of Winslow,* 365 F.2d 1017, 1020, 53 Cust. & Pat.App. 1574 (Cust.Pat. App.1966). The determination to be made, then, is whether the subject matter of the Hoadley patent would have been obvious to a skilled engineer in the fastener field who was addressing the same problem and who was aware of the pertinent prior art.

### III. *The Prior Art*

Numerous examples of patented and non-patented devices which the parties agree constitute "prior art" under 35 U.S.C. Sec. 103 were presented to the Court in the course of the trial. ITW sought to illustrate their perspective of the development of the Hoadley screw anchor by introducing a "Hoadley Invention History" chart exhibiting five prior art devices: a metal plate, ITW screw grommets, ITW plastic ⅛ turn anchor, Simmons back-up plate, and the Ryder Varinut. Simmons, however, focused the Court's attention on three devices upon which their claim of obviousness primarily rests: the Knowlton fastener, the above-mentioned Simmons back-up plate, and the Krueger fastener.

The Patent Office cited seven patents which it found pertinent to the Hoadley invention. The Krueger fastener was the only one of the above-mentioned devices on its list. Of the remaining six Patent Office references, only the Phelan patent warrants description in this section.

In its attempt to comprehend the prior art, the Court was assisted by the relative simplicity of the devices and the mechanical principles they incorporate. The Court's understanding was greatly enhanced by the introduction of physical exhibits, photographs, diagrams, and patent descriptions, in addition to the explanatory efforts of the parties' expert and fact witnesses. This evidence revealed the following characteristics of the prior art:

A. *Metal Plate:* A simple plate of often scrap metal with a punched screw hole, which is held in place on the insulation side of the liner and sealed against leakage by conventional masking tape. The fastener is not self-adhering and requires a tool such as an awl to align the hole in the part with the hole in the liner until the tape is applied. Tape is not a dependable means for sealing the hole in the liner, as foam on occasion gets under the plate and leaks into the cabinet.

Installation is difficult; it requires one hand on either side of the liner and, depending on the location of the hole, might require two workers. The strip torque, or capacity of the part to withstand the turning force of a screw, tends to be low.

B. *ITW Screw Grommet and Backing Plate:* A nylon nut which is pressed through the liner to engage a metal backing plate. The screw grommet is sealed with either plastisol (a soft plastic) or a foam gasket material, but masking tape is sometimes required to augment the sealing. The backing plate is needed to distribute the load over an expanse of liner; otherwise the load would be directed entirely to the edges of the square aperture in which the grommet was inserted. The plate has "wings", or bent edges, which make it easier to grasp and may impede rotation of the plate due to friction against the insulating foam. However, the wings sometimes snag on the outer shell during installation and fall off. In situations where the liner is thinner than anticipated, the backing plate

---

4. The parties agree, and the Court finds, that the "person having ordinary skill in the art", 35 U.S.C. § 103, is in this instance an experienced engineer, who may or may not be a graduate engineer; and the pertinent art is the appliance fastener art.

will not be clamped tightly against the liner surface, and will not be effective in distributing the load.

Installation of the screw grommet requires two hands and, depending on the location of the hole, might require two workers. Because it is made of plastic, it does not have the higher strip torque of a metal screw anchor.

C. *ITW Plastic ⅛ Turn Anchor:* A plastic anchor resembling, perhaps, a miniature infant's pacifier. The anchor is twisted into position in a square hole in the liner, and is sensitive to variations in both liner thickness and hole size. The screw receptical tube is closed at its tip and, together with the flange which rests against the liner, seals the aperture. Installed, the anchor protrudes slightly into the cabinet side of the liner, creating certain production difficulties. The protrusion also prevents flush attachment of parts in the refrigerator cabinet.

Installation requires only one hand but could involve cumulative stress on the assembler's fingers if the part fits too tightly in the liner. Strip torque is relatively low.

D. *Knowlton Fastener*[5] (patent issued August 9, 1966): Patented under the title, "SEALED FASTENING DEVICE", the evidence depicts a single metal plate folded into two layers (App. B Fig. 7). The insulation-facing layer contains a central helical screw impression (Fig. 6 # 18), which allows for high strip torque when anchoring a screw. Two "arms" protrude from the liner-facing layer of the plate (Fig. 7 # 2a), which serve to locate and mechanically attach the device to the liner. Both arms are struck from within the margins of the liner-facing layer, creating an opening through which a screw can pass to reach the helical screw impression in the insulation-facing layer. One of the arms is bent directly toward the liner; the other is first bent toward the insulation, then folded back toward the liner, creating a "loop" in the insulation area (App. C). Although the arms are spread slightly further apart than the size of the aperture, the arm formed from the loop exhibits a spring-like quality, and flexes toward its partner when the device is snapped into place on the liner.

On the end of each arm is a burr (App. B Fig 7 # 5a) which, driven into the inner sides of the aperture by the spring action of the arms, grips the liner and holds the device in place. The arms ordinarily do not protrude through the liner into the cabinet.

To prevent foam leakage, the Knowlton fastener is coated with plastisol on its insulation-facing layer (Fig. 8 # 7a). Plastisol, a soft plastic, is an effective sealant without adhesive qualities.

The Knowlton fastener is analyzed further, *infra,* in the course of comparing its teachings with the claims of the Hoadley patent.

D. *Krueger Fastener* (patent issued January 17, 1967):[6] This device is covered by a patent entitled, "FASTENER HAVING A LAYER OF FOAMED RESINS WITH INDEXING MEANS PROJECTING THERETHROUGH." The relevant embodiment is a flat metal plate with a central, punched-out screw hole (App. D Fig. 1), and with double-sided adhesive tape on its face for adherence to the liner (Fig. 1 # 3). The patent specification suggests not piercing the tape so that the fastener "can be made to act like a self-locking nut and thereby resist loosening when subjected to vibration." *Plaintiffs Exhibit* 6, Column 3, Line 48–50.

The Krueger device exhibits a single locating tab, sheared from the perimeter of the plate, which pierced the layer of tape and would engage the slotted hole in the liner (Fig. 7 # 23). There was a difference of opinion between Simmons' and ITW's

---

**5.** Unfortunately, neither party was able to produce a Knowlton fastener for the Court to examine. However, the Court was adequately informed as to the fastener's features and properties by documentary and testimonial evidence, including a copy of the patent with accompanying diagrams, the testimony of E. Knowlton who invented the device, and the testimony H. Sneck, a mechanical engineering professor who studied the patent for the purpose of this litigation. Diagrams of the Knowlton fastener appear as Appendix B and C to this decision.

**6.** A diagram of the Krueger fastener appears as Appendix D to this decision.

experts as to whether, in the process of shearing the tab, the adhesive was torn creating a gap which would permit leakage. The issue is discussed below in the course of comparing the Krueger patent with the Hoadley claims.

E. *Phelan Patent* (issued July 9, 1968): This patent relates to a method for installing a threaded fastener insert into a plastic liner. It involves the use of a disposable holder, ordinarily made of sheet metal, with a winged edge for grasping and adhesive on its face for attachment. While the holder is in place, an "uncured potting compound" is injected past it, which then hardens and secures the fastener in place.

F. *Simmons Back-up Plate*[7] (introduced commercially 1969): A metal plate with winged edges for grasping and a central, butterfly shaped hole which anchors a corresponding Simmons "spring-lock peg" rather than a screw. The plate has two arms, which extend from the winged edges first toward the central hole and then downward through the corners of that hole. The portions of the arms which protrude through the hole serve to locate the fastener in relation to the liner hole, and mechanically hold the fastener to the liner by grasping the edges of the hole. Sealing against leakage was accomplished by the use of single sided tape, such as masking tape, applied on the back of the fastener. The Simmons back-up plate should not be confused with the accused product, the Simmons nut plate.

G. *Ryder Varinut* (patent issued 1973): Entitled "NUT TYPE FASTENER" in its patent, the device is a plastic, self-adhering fastener for square holes. It adheres to the liner by the presence of strips of double sided tape on the fastener's face. It is sealed by a plastic membrane across the screw hole. Ryder has no wings to ease handling or to embed in foam insulation. It

also has relatively low load distribution properties.

IV. *The Hoadley Invention and Patent*

Before attempting to ascertain the differences between the prior art and the claims at issue, some background on the development of the Hoadley invention and prosecution of the Hoadley patent is warranted. As mentioned previously, the device was invented by James E. Hoadley while he was within the employ of the defendant, ITW. Hoadley, who has a bachelor's degree in mechanical engineering, worked for Underwriter's Laboratories ("U.L.") for nine years prior to coming to ITW, and became very familiar at U.L. with plastic liner foamed-in-place refrigerators. In 1971, he joined ITW as a salesman selling fasteners to refrigeration manufacturers. Various customers expressed to Hoadley the problems they were having with fasteners for plastic liners. One customer in particular, Kelvinator, expressed dissatisfaction with the ITW plastic grommets it had been using. This induced Hoadley to offer to devise an alternative.

A short time after addressing himself to the problem, Hoadley proposed a solution to ITW: a metal plate with a helical screw impression, wings, double sided adhesive tape and upstanding tabs which protrude through the tape. Hoadley testified that his proposal constituted a change in direction in ITW's fastening technology, which had been largely committed to all-plastic fasteners.[8]

On May 8, 1972, an application was filed for a patent on the Hoadley invention. Prosecution of the patent was supervised by ITW, through its attorney J.R. Halvorsen. The file wrapper indicates an initial assertion of eight claims, with no disclosure of prior art. After an independent search, the Patent Office cited seven prior art refer-

---

**7.** A diagram of the Simmons back-up plate appears as Appendix E to this decision.

**8.** Indeed, the defendant ITW devoted considerable effort in this litigation to tracing the development of the plastic fasteners which preceded Hoadley, presumably to highlight the innovativeness of the Hoadley invention. Those ef-

forts, however, are not particularly helpful to the Court since the relevant inquiry here, as stated previously, is whether a skilled engineer in the fastener field, who is presumed to know the most pertinent prior art, would have found the solution proposed by Hoadley to be obvious.

ences and rejected every claim, under § 103, as "unpatentable over Krueger", or "unpatentable over Krueger in view of Phelan". *Plaintiff's Exhibit* 3 at page 18. An amended application asserting only four claims was similarly rejected. A second amended application asserting four claims and adding remarks which purported to distinguish the Krueger patent resulted in the allowance of all four claims. The patent was issued April 9, 1974.

## V. *The Witnesses*

To enable the Court to recognize the teachings of the prior art and the differences between such teaching and the claims at issue, the parties produced a multitude of devices and documents, and examined expert and other witnesses. ITW called as its expert E.G. Swick, a senior engineer at ITW who had extensive experience in the appliance fastener field. Simmons produced H. Sneck, a professor of mechanical engineering at Rensselaer Polytechnic Institute with impressive academic qualifications. Although ITW downgrades H. Sneck's qualifications because of his admitted lack of specific familiarity with refrigerator fasteners or with patent law, the Court finds no disparity between the competency of these experts with respect to the subject of their testimony. The issues to be determined required an understanding of basic mechanical principles and the language of mechanical engineers; both experts were adequately trained to assist in this regard. Where the experts have disagreed, the Court has resolved the issue on the basis of what it perceives, after considering the evidence as a whole, to have been the more persuasive viewpoint (as opposed to adopting the views of the witness with the more impressive credentials).

In addition to the expert witnesses, two fact witnesses gave testimony relevant to the comparison undertaken by the Court. J. Hoadley, inventor of the patented screw anchor, was called by ITW to explain the development and advantages of that device. E. Knowlton, inventor of the patented Knowlton fastener, was called by Simmons to discuss that piece of prior art.

## VI. *Differences Between the Prior Art and the Claims at Issue*

For the purpose of comparison with the prior art, only Claims 1 and 2 of the Hoadley patent are relevant. The language of those claims, spaced here for greater readability, is as follows:

1. A screw anchoring device for pre-assembled aperture sealing attachment with an apertured panel to confine material, such as insulating material foamed in place between the panel and attached spaced wall or other structure; and comprising

a plate member having a central aperture forming a helical screw receiving impression and a generally flat portion

a pair of upstanding tabs projecting from one face of the generally flat portion of said plate member at opposite sides of and adjacent to said screw impression, said tabs being struck from within the margins of said plate member,

and a continuous pad of a material capable of being penetrated by said screw and having an exposable adhesive surface substantially covering and carried by the plate member with the tabs projecting for entry into the panel aperture and through said pad to locate the anchoring device and with the adhesive surface of the pad extending across the panel aperture for mounting and sealing adherence to the adjacent panel surface whereby to prevent egress of trapped material through the panel aperture, and with the screw impression in position for threaded engagement with a screw passed through the panel aperture and the pad for attachment of a utility component to the opposite panel surface

and one or more wing portions formed from said plate member at one or more edges of said flat portion of said plate member, said wing portions being angled away from the face thereof opposite to that of the tabs and adapted to be embedded in the foamed material for supplementing the other anti-rotative features of the anchor.

2. An anchoring device as claimed in Claim 1, wherein the adhesive pad is double faced for attachment to the plate member and to the panel surface.

■ It will not be necessary to compare the Hoadley claims with all of the previously mentioned examples of prior art. An examination of the combined teachings of the Knowlton fastener, the Simmons back-up plate, and the Krueger fastener affords sufficient basis for concluding that the subject matter in the Hoadley patent is obvious.

### A. Comparison with Knowlton

In general, the metal parts of the Knowlton fastener correspond to the metal parts of the Hoadley patent. Claim 1 of the Hoadley patent states that it is:

A screw anchoring device for pre-assembled aperture sealing attachment with an apertured panel to confine material, such as insulating material foamed in place between the panel and an attached spaced wall or other structure.

That description is as applicable to the Knowlton patent as to Hoadley patent. Both are screw anchor devices for refrigerators using foamed-in-place insulation.

Claim 1 of the Hoadley patent then identifies six elements which comprise that device. Four of those elements are present in Knowlton. The first claim element is a "plate member". Knowlton exhibits a single plate, folded into two layers. The second element is that the plate member has "a central aperture forming a helical screw receiving impression". Knowlton, too, utilizes a helical screw receiving impression; it is positioned in the center of the folded plate member. The third element claimed by Hoadley is a "generally flat portion". The Knowlton fastener also has a generally flat portion which, as in Hoadley, distributes the load over an expanse of liner.

The fourth element of the Hoadley claim is:

a pair of upstanding tabs projecting from one face of the generally flat portion of said plate member, at opposite sides of and adjacent to said screw impression,

said tabs being struck from within the margins of said plate member.

ITW argues that Knowlton has nothing to teach as to this element since, in their view of Knowlton, the plate member that carries the screw impression is not the same as the plate member out of which the tabs are struck. While agreeing that the Knowlton device is not structurally identical with the Hoadley device because of its double-layered aspect, it nevertheless must be noted that the Hoadley claim language is fairly applicable to the Knowlton description. As stated previously, Knowlton is one plate folded over: the top and bottom layers are parts of one continuous metal strip. Its two arms do literally project from the flat portion, though one arm is first bent one way and then looped the other way before passing through the central hole. Those projecting arms are positioned at opposite sides of and adjacent to the screw impression when the fastener is in its completed state; and the arms are struck from within the margin of the plate member.

Technical readability aside, a glance at the Knowlton patent diagram (App. B Fig. 7 # 2a) strongly suggests the particular feature which ITW argues is unique to Hoadley: one can easily recognize two tabs (called "arms" by Knowlton) projecting from the plate on opposite sides of the screw impression. It is only upon close scrutiny of the diagram that one perceives the peculiarities of Knowlton—its double-layered aspect and the detour made by one arm—which ITW asserts renders Knowlton impertinent. The Court, however, concludes that the use of arms in Knowlton is highly suggestive of, though not identical to, the use of tabs claimed by Hoadley, and thus highly relevant to this inquiry as to the obviousness of the patented subject matter.

ITW also denied that the arms in Knowlton provide the same advantages of the Hoadley tabs, i.e., flush mounting, use with panels of different thickness, use with any size liner hole. However, the first two advantages are clearly achieved by Knowlton: the arms are specifically designed to not

extend into the cabinet, despite variations in liner thickness. ITW's argument that the Knowlton arms could protrude if the liner happened to be extremely thin and the arms too long proves nothing. The Hoadley screw anchor could also be disfunctional if the liner were extremely thin and the tabs too long. It appears, however, that in the ordinary case, neither device protruded into the cabinet, and both allowed for flush mounting of whatever appliance was to be installed.

As for usability with any shape aperture, there was some testimony by Simmons' expert H. Sneck that the Knowlton device would grasp the hole whatever its shape. It is clear to the Court, however, that positive attachment would be best achieved with a rectangular hole, in order for the liner to be grasped along the full width of Knowlton's arms.

ITW has also argued that the Hoadley tabs are distinguishable from the Knowlton arms on the basis of their respective functions: the tabs serve to locate while the arms serve to grasp the liner. Recognizing that the Knowlton arms perform a grasping function not exhibited by the Hoadley tabs, the Court nevertheless concludes that those arms also perform a locating, even a self-locating function. By self-locating, what is meant is that the fastener has the ability of finding its way into its proper position on the liner without precise visual alignment by the assembler. Although the tabs may "slip" into their proper location while the arms, because of their spring-like quality, must "snap" into place, the Court fails to see how one is any more self-locating than the other.[9] This locating function of the Knowlton arms is not negated by the importance of their attachment function.

The fifth claim element, "wing portions", is not found in Knowlton. Simmons, however, contends, and the Court agrees, that the "loop" in the Knowlton fastener (App. B Fig. 7 # 6) serves much the same func-tion, though perhaps not by design: it enables the piece to be grasped more easily and, when imbedded in foam, affords some anti-rotative friction. A considerable amount of argument was devoted to the relative merits of the Hoadley wings versus the Knowlton loop, a question which the Court finds insignificant. The use of wings was well known to skilled engineers in the fastener field. Indeed, the first rejection of the Hoadley patent application was based in part on the Patent Office finding that "It would be obvious to provide one or more wing portions for manipulating the device as taught by Phelan...." *Plaintiff's Exhibit* 3 at 18.

The sixth and final claim element is not the same in the Hoadley and Knowlton patents. The Hoadley patent calls for "a continuous pad of material capable of being penetrated by said screw and having an exposable adhesive surface...." The pad is on the front face of the fastener, "with the tabs projecting ... through said pad...." Claim 2 elaborates on this element, specifying that the adhesive pad be "double faced for attachment to the plate member and to the panel surface."

Knowlton does not use double sided-tape on its face for attachment or sealing. Instead, as described above, it is attached by the use of arms which mechanically hold the fastener to the plastic liner. For sealing, Knowlton uses a plastisol coating on the back of the fastener. This is the major difference relied upon by ITW for its assertion that Knowlton is not pertinent. It is Simmons' position, however, that the use of double-sided tape was well known to skilled engineers in the fastener field at the time the Hoadley screw anchor was invented, and that it would have been obvious for an engineer to simply apply double sided tape to the front of the Knowlton device, which would then obviate the need for sealant on the back. The resulting device would then,

---

9. As stated previously, the Court has not had the benefit of examining an actual Knowlton fastener. There is ample support for its conclusion, however, from the testimony of Knowlton and Sneck. Moreover, the Court has physically examined the Simmons back-up plate, which also attaches by spring-arms. That examination very clearly reveals a self-locating function, despite ITW's argument to the contrary, which is based on the same reasoning as its argument with respect to Knowlton.

except for the absence of non-crucial wings, match the Hoadley claims. The Court accepts this position, for reasons elaborated upon in its concluding discussion.

### B. Comparison with Simmons Back-up Plate

Because the Simmons back-up plate is designed to anchor a Simmons "spring peg" rather than a screw, it does not match the introductory portion of the Hoadley claim, which announces "a screw anchoring device". Nevertheless, the device does exhibit three of the Hoadley claim elements and strongly suggests a fourth. The back-up plate unquestionably has the first and third elements, a "plate member" and a "flat portion". The second element is "a central aperture forming a helical screw receiving impression". Simmons exhibits a central aperture, but it is butterfly shaped and is not a screw receiving impression. The use of screw receiving impressions was widely known before the Hoadley patent. The Knowlton patent has such a screw receiving impression, as do two patents cited as prior art by the Patent Office (Tinnerman and Kost). It would have been obvious, at the time the Hoadley invention was devised, to replace the butterfly hole in the Simmons back-up plate with a screw impression, if one wished to retain a screw.

The fourth element is "a pair of upstanding tabs projecting from one face of the generally flat portion of said plate member at opposite sides and adjacent to the screw impression." The Simmons back-up plate has two upstanding tabs at the end of the spring arms, which are on opposite sides of and adjacent to the butterfly shaped aperture. The tabs are not "struck from within the margins" of the plate; but after bending, they are within the margin (App. E).

The tabs in the Simmons back-up plate, like the arms in the Knowlton patent, perform two functions. One function is to locate the device in relation to the liner hole. ITW argues that the Simmons tabs, like the Knowlton arms, do not self-locate the device as the Hoadley tabs do, because the Simmons tabs are initially spread wider than the aperture they enter. But, as discussed before with respect to Knowlton,

that view is not convincing to the Court. The Court's own examination of the exhibits indicates that the Simmons fastener simply "snaps" into proper place, as opposed to the Hoadley screw anchor which "slips" into place. That difference does not warrant a finding of a unique self-locating property in the Hoadley device.

The other function of the Simmons tabs is to mechanically fasten the device to the liner. As with Knowlton, the presence of this second function does not negate the teaching of the first.

The fifth element is the "wing portion". The Simmons back-up plate discloses the use of wings that are virtually identical to those subsequently employed by Hoadley.

The sixth element, Hoadley's use of double-sided tape on the front of the plate, is not a feature of the Simmons back-up plate. Instead, the Simmons device attaches by the use of springarms, and is sealed with single sided adhesive tape, such as masking tape, placed on its back. Simmons' argument is that it would have been obvious to modify its back-up plate by removing the single sided tape from the back and placing double sided tape on the front. A helical screw impression could then be incorporated if screw attachment was desired. The Court's conclusions in this regard appear in the final section of this decision.

### C. Comparison with Krueger Fastener

Unlike the Knowlton and Simmons devices, Krueger was discovered and cited by the Patent Office. Krueger matches the Hoadley claim's initial description, since both are screw anchoring devices with, as discussed below, sealing capability. The first and third Hoadley elements, a "plate member" and a "flat portion", are also disclosed by Krueger. However, instead of a "central helical screw impression", the third element, Krueger exhibits a central threaded hole for anchoring a screw.

Krueger does not have the fourth element of Hoadley, a "pair of upstanding tabs ... struck from within the margins of said plate member". However, it does reveal the use of one upstanding tab, referred to

as a "turned down stake", which serves to locate the device into position on the liner (App. D Fig. 7 # 23). The addition of a second locating tab in Hoadley was expressly found by the Patent Office to be of "no patentable significance since such modification would merely be a duplication of that which is already taught by Krueger". *Plaintiff's Exhibit* 3 at 18. The Patent Office also found it insignificant that the Hoadley tabs are struck from within the plate margin while the Krueger tab is struck from the perimeter of the plate. *Id.* at 18.

Krueger does not disclose the fifth element of Hoadley, the "wings". Here again, the Patent Office expressly found, in the course of rejecting ITW's second application, that

> To provide the plate member 1 in Krueger with one or two more wing portions for manipulating the device as taught by Phelan in column 3, lines 52–61, would be obvious.

*Id.* at 23.

The last element of Hoadley is the adhesive pad on the fastener's face, "capable of being penetrated by said screw . . . with the tabs projecting . . . through said pad." Krueger teaches the use of an adhesive pad, or double-sided tape, on the fastener's face. ITW strenuously argues, however, that Krueger does not teach the use of tape as a sealant. In its attempt to overcome its second patent rejection by emphasizing the absence of a sealing property in Krueger, ITW represented to the Patent Office as follows:

> Each of the references of record show a punched hole for acceptance of the screw member with the punched hole traversing both the sheetmetal portion and the adhesive pad as well.

*Plaintiff's Exhibit* 3 p. 27. However, while the diagram appended to the Krueger patent does clearly show the punched hole traversing the pad in Figures 2 and 3, there is no disclosure of a perforation in Figures 1, 4, 5, 6, 7, and 9 (as for Figure 8, there is a debate as to whether it shows an adhesive pad at all. See discussion, *infra.*) But more important, the Krueger Patent specifications expressly suggest not punching the adhesive, and allowing penetration of an intact pad by the screw:

> An unobvious quality of some versions of the above described fastener is that they can be made to act like a self-locking nut and thereby resist loosening when subjected to vibration. This may be done by omitting the perforation from the foam layer where it aligns with tapped hole 2 in the plate member.

*Plaintiff's Exhibit* 6, column 3, lines 46–52.

ITW, however, advised the Patent Office that the adhesive would have a gap in it, permitting leakage, because of the way the tab was struck:

> The Krueger reference utilizes a member having the tab 23 sheared from the perimeter of the device leaving an open or exposed area within the adhesive pad which fails to serve as a sealing member for the aperture 20.

*Plaintiff's Exhibit* 3, p. 27. Simmons contests the accuracy of this statement, contending that the tab projects through the pad, and does not impair the sealing capability of the pad. Simmons' expert H. Sneck pointed out that Figure 7 in the Krueger patent clearly depicts the tab projecting through the pad, without any indication of a gap. He further argues that Figure 8, a view from the top of the device, does not reveal any adhesive beneath the slot where the tab had been struck because it is an illustration of only the metallic part of Figure 7.

The Court accepts Professor Sneck's analysis as a logical explanation for the apparent discrepancy between figures 7 and 8. The view that the tab penetrates, rather than tears, the pad finds support in Krueger's title, "FASTENER HAVING LAYER OF FOAMED RESIN WITH INDEXING MEANS PROJECTING THERETHROUGH", and in Krueger's claim, which states that the protuberance extends "through the conformable layer". *Plaintiff's Exhibit* 6, column 4, line 42. It consequently appears that, due to ITW's unqualified statements made in the course of the *ex parte* patent prosecution, the Patent Ex-

aminer may not have fully appreciated the sealing property of the Krueger device.[10]

VII. *The Level of Ordinary Skill in the Pertinent Art*

As mentioned previously, the art to which the Hoadley patent belongs is the appliance fastener art; the level of ordinary skill in that art is that of an experienced engineer, who may or may not be a graduate engineer. The usefulness of each of the individual features utilized in the Hoadley patent—a plate, a helical screw impression, wings, tabs, and double sided tape—were all well known to the experienced engineer in the fastener art. The obviousness of combining them is discussed below.

VIII. *Secondary Considerations*

*Graham v. John Deere Co., supra,* permits the Court, in its effort to determine nonobviousness, to consider "[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure to others, etc." 383 U.S. at 17, 86 S.Ct. at 694. With respect to the first factor, there has been undisputed evidence that the Hoadley device was and remains commercially successful. Whether or not it truly satisfied "long felt but unsolved needs" depends on whether such needs are considered individually or collectively. ITW identified for the Court twelve advantages afforded by their product; in each instance one of the prior art devices affords the same advantage (and the Knowlton device figures in virtually every category):

1. Self-locating tabs: Knowlton and the Simmons back-up plate have self-locating tabs.

2. Positive and dependable attachment: Knowlton, Simmons, and Krueger attach securely.

3. Panel aperture sealed: Knowlton seals the hole through plastisol; there is an inferable sealing capacity in Krueger.

4. Screw retention of components: Knowlton will retain a screw in the same manner as Hoadley: Krueger will also retain a screw.

5. Ease of gripping and handling: Knowlton is easily grasped by its upstanding loop; Simmons is easily grasped by its wings.

6. Load distribution: Knowlton, Simmons and Krueger each distribute the load over an expanse of liner.

7. Anti-rotation: Knowlton's upstanding loop and Simmons' wings resist rotation.

8. Useable with any shaped aperture: Although there was testimony that Knowlton could be used in either a rectangular or round aperture, it is apparent that the device is designed for use in the former. The Krueger device, however, may be used with any shaped aperture.

9. Flush mounting to inside surface of the panel: Neither Knowlton or Krueger protrude into the food compartment.

10. Economical to manufacture: No comparative cost or price figures were presented to the Court. Testimony as to manufacturing processes enable the Court to infer that the Knowlton device, though economical, was somewhat more costly to produce than the Hoadley device. There is no basis for concluding, however, that the Hoadley device was more economical than Simmons or Krueger.

11. Useable with panels of different thickness: As Knowlton testified, "one of the express purposes" of his device was to afford this advantage. Krueger also would be useable with panels of varying thickness.

---

**10.** Moreover, the Court cannot help but conclude that, had there been a leak in Krueger due to a tear in the pad, it would have been obvious to one seeking a complete seal to pro-

pose tabs which pierce, rather than tear the pad. *C.f. Mollura v. Miller,* 609 F.2d 381 (9th Cir.1979) ("There is no inventive genius in putting water into a container that does not leak").

12. Adapted to be made of metal: Knowlton, Simmons, and Krueger are metallic.

Thus the "unsolved need" satisfied by Hoadley could only be found, if at all, in marketing a device which combines these advantages.

The final secondary consideration expressly noted in *Graham v. John Deere Co., supra,* is the failure of others. ITW's characterization of the prior art as "failed attempts" is not accurate, since Knowlton, Simmons, and Krueger fasteners each afford many of the same advantages that Hoadley affords. However, it is clear that the Hoadley device, by combining elements present in the prior art, constituted an improvement over any individual prior fastener. This is evidenced not only by its commercial success but by the limitation of others, including Simmons. Improvement, however, does not render the improved upon art "failed attempts". Nor is it dispositive of the question of obviousness.

IX. *Conclusions*

█ A patent duly issued by the Patent Office carries with it a statutory presumption of validity. 35 U.S.C. § 282. Although it is often said that the presumption only requires "that reasonable doubt on the question of validity be resolved in favor of the patent holder", *Lemelson v. Topper Corp.,* 450 F.2d 845, 849 (2d Cir.1971); *quoting, Lorenz v. F.W. Woolworth Co.,* 305 F.2d 102, 105 (2d Cir.1962), the Court will accept for the purpose of this case the arguably more exacting formulation, that an unimpaired presumption "imposes upon the party asserting invalidity the burden of establishing its claim by clear and convincing evidence." *CTS Corp. v. Electro Materials Corp. of America,* 469 F.Supp. 801, 819 (S.D. N.Y.1979).

█ That presumption of validity is undercut where, as here, the Court has before

it evidence of highly pertinent prior art which was not considered by the Patent Examiner. *Pevar v. United States,* 215 U.S.P.Q. 265, 280–81 (Ct.Cl.1982); *Egley v. United States,* 576 F.2d 309, 313 (Ct.Cl. 1978); *General Electric Co. v. United States,* 572 F.2d 745, 761 (Ct.Cl.1978); *Julie Research Laboratories, Inc. v. Guideline Instruments, Inc.,* 501 F.2d 1131, 1136 (2d Cir.1974); *Triax Co. v. Hartman Metal Fabricators, Inc.,* 479 F.2d 951 (2d Cir.1973); *Kurt H. Volk Inc. v. Foundation for Christian Living,* 213 U.S.P.Q. 756, 765 (S.D.N.Y. 1982); *Janex Corp. v. Bradley Time,* 460 F.Supp. 383, 385 n. 5 (S.D.N.Y.1978). That presumption must also be lowered with respect to comparisons between the Hoadley claims and the Krueger patent, because the defendant's statements concerning the lack of sealing capability in Krueger engendered a danger that the Patent Examiner would not appreciate those properties which this Court has determined are inferable from Krueger. *C.F. Kahn v. Dynamics Corp. of America,* 508 F.2d 939, 942 (2d Cir.1975) (presumption of validity does not attach where there is evidence that the Patent Office has been misled as to the true import of prior art references).

The parties have devoted considerable energy to debating which prior art fastener was the most pertinent, with Krueger and Knowlton as the leading candidates. The Court does not consider the issue crucial, since the non-disclosure of a highly pertinent prior art device, which Knowlton clearly is, will weaken the presumption whether or not that device is determined to be the single most pertinent example of prior art. *See, Pevar, supra* at 280–81; *Egley, supra* at 313; *General Electric, supra* at 761; *Julie Research Laboratories, Inc., supra* at 1136; *Volk, supra* at 765; and *Janex, supra* at 385 n. 5, none of which specify that only the non-disclosure of the most pertinent piece of prior art affects the presumption.[11] Assuming that a choice is

---

11. There is some indication that where the most pertinent prior art is not disclosed, the presumption is not merely weakened, but eliminated. *See, Douglas v. U.S.,* 510 F.2d 364 (Ct. Cl.1975).

warranted, the Court is constrained to find that the Krueger patent, when considered for all that it fairly discloses, including its sealing capability, is the most pertinent art. However, if its sealing capability is to be rejected, as ITW urges, then Knowlton must be considered the most pertinent prior art since only Knowlton would combine attachment and sealing capability in a metal fastener. Thus, the Patent Office either failed to consider the most pertinent prior art (Knowlton) or considered the most pertinent prior art but was diverted by ITW's statements from its pertinence (Krueger). In either case the Court finds that the statutory presumption of validity is substantially weakened with respect to a determination of obviousness in light of the prior art Knowlton, Simmons and Krueger fasteners.

■ As stated previously, in making its determination as to obviousness, the Court must assume that the inventor was aware of all the pertinent prior art. *Pevar, supra* at 277; *Application of Wood, supra* at 1036; *Lockheed, supra* at 461; *Maclaren, supra* at 1378; *Winslow, supra* at 1017. It is not necessary that the claim be proven obvious in light of any single prior art reference; it may be obvious in view of the combined teachings of more than one reference. *In re Keller,* 642 F.2d 413, 425 (Cust.Pat.App. 1981); *Orthopedic Equipment Co., Inc. v. United States,* 212 U.S.P.Q. 523, 533 (Ct.Cl. 1981); *see also, Maclaren, supra* at 1378. Moreover, the Court is not limited to considering only the precise teachings of the prior art; it must also consider the inferences one skilled in the art would draw therefrom. *In re Keller, supra* at 425; *Application of Preda,* 401 F.2d 825, 826, 56 Cust. & Pat.App. 706 (Cust.Pat.App.1968); *Application of Simon,* 461 F.2d 1387, 1390 (Cust.Pat.App.1972); *CTS Corp. v. Electro Materials Corp. of America,* 469 F.Supp. 801, 820 (S.D.N.Y.1970). Thus, the existence of differences between the prior art and the invention do not save a patent from invalidation if the modification was itself obvious. *Dann v. Johnston,* 425 U.S. 219, 230, 96 S.Ct. 1393, 1399, 47 L.Ed.2d 692 (1976).

The Court's review of the prior art and comparison of that art with the Hoadley patent reveals the Hoadley patent to be a "combination patent", in which all of the component parts (a plate, a screw impression, wings, tabs, and double-sided tape) were old and well known to skilled persons in the art. The Supreme Court has consistently instructed that,

> Courts should scrutinize combination patents with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. . . . A patent for a combination which only unites old elements with no change in their respective functions . . . obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. . . .

*Sakraida v. Ag. Pro.,* 425 U.S. 273, 281, 96 S.Ct. 1532, 1537, 47 L.Ed.2d 784 (1975); *quoting, A & P Tea Co. v. Supermarket Corp.,* 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950); *see also Anderson's-Black Rock, Inc. v. Pavement Salvage Co.,* 396 U.S. 57, 61–63, 90 S.Ct. 305, 308–09, 24 L.Ed.2d 258 (1969).

■ Of course, the Court agrees that "the mere fact that each of the elements making up the combination covered by the claims in suit appears somewhere in the prior art of record does not by itself negate patentability." *Egley v. United States, supra* at 313. Indeed, it has been observed that "substantially all inventions are for the combination of old elements. *Safety Car Heating & Lighting Co. v. General Electric Co.,* 155 F.2d 937 (2d Cir.1946) (L. Hand, C.J.). The proper test, then, must be whether the combination itself—that is, the arrangement of old elements, would have been obvious to a person skilled in the art, *Maclaren, supra* at 1377–78; *Egley, supra* at 314; and this test must be applied with strict scrutiny, as per the instructions of the

Supreme Court. *Sakraida, supra; Volk, supra* at 764; *MacLaren, supra* at 1375–76; *Dielectric Laboratories v. American Tech. Ceramics,* 545 F.Supp. 292, 297 (E.D.N.Y. 1982).

The plaintiff has established that every component of the two Hoadley claims in issue is collectively disclosed by or inferable from Knowlton, Simmons and Krueger. The most serious controversy in this regard concerns whether the prior art teaches the use of double-sided tape (or an adhesive pad) on the face of a fastener as a sealant, rather than merely an adhesive. ITW's assertions to the Patent Office notwithstanding, the Court specifically finds that such attribute is fairly inferable from Krueger. Though Krueger does not expressly claim a sealant quality (presumably because it was not specifically designed for use with foamed-in-place refrigerators) it does expressly suggest leaving the adhesive pad intact, in which case the fastener would undoubtedly seal the aperture in the precise manner that the Hoadley fastener does. The fact that Hoadley claims this sealing attribute while Krueger does not is of no consequence. As the Second Circuit has stated in the course of rejecting a similar argument by a patentee:

> They are, in effect, arguing that a structure suggested by the prior art, and hence, potentially in the possession of the public, is patentable to them because it also possesses an *inherent* but hitherto unknown function which they claim to have discovered. This is not the law. A patent on such a structure would remove from the public that which is in the public domain by virtue of its inclusion in, or obviousness from, the prior art. (citation omitted).

*Application of Wiseman,* 596 F.2d 1019, 1023 (2d Cir.1979). *See also, General Electric Co. v. Jewel Incandescent Lamp Co.,* 326 U.S. 242, 249, 66 S.Ct. 81, 84, 90 L.Ed. 43 ("It is not invention to perceive that the product which others have discovered had qualities they failed to detect"); *CTS Corp.*

*v. Electro Materials Corp. of America, supra* at 822.

The remaining, and ultimate question then is this: would it have been obvious for a skilled engineer in the fastener field, working with the Knowlton, Simmons and Krueger references before him, to arrive at the arrangement patented by Hoadley? The Court concludes that it would have been obvious. The Hoadley combination would have been obvious to reach through any of several paths of basic mechanical reasoning.

Challenged by his customers to devise a fastener to meet their needs, the inventor might start with Knowlton as his prime reference and ponder how to improve it. Utilizing the teachings of Krueger, he would adopt the idea of double-sided tape on the front, with the tabs protruding through the tape to continue their locating function. Now that the device was adhesively attached, there would no longer be a need for spring action or burrs on the arms, and those superfluous features would be eliminated. The result would essentially duplicate the Hoadley screw anchor.

Or the inventor might start with the Simmons back-up plate as his reference and question how he might shorten the tabs so there is no unsightly protrusion through the liner, yet still attach the fastener to the liner. Krueger, again, would instruct him to utilize double-sided tape on the front. Elimination of the spring action arms would follow as a matter of course. A screw impression could quite obviously be added if screw attachment were desired. The result would be duplicative of the Hoadley screw anchor.

Finally, the inventor could begin with a consideration of Krueger, and seek to improve its locating, grasping, and sealing capabilities. The addition of a second protruding tab would be obvious to improve locating, even if Knowlton and Simmons had not previously taught the use of two tabs. The addition of wings would be obvious to improve grasping and incidentally

enhance the anti-rotative quality of the fastener. As for sealing, it is not clear that any modification would be necessary, since the nonperforated version suggested by Krueger would not leak, unless there was a tear where the tab had been struck. If so, the obvious modification would be to make the tab pierce, rather than tear the tape. The resulting fastener duplicates the Hoadley screw anchor.

The Court acknowledges that there is no evidence before it that the actual inventor, J. Hoadley, followed any of the inventive paths set forth above. Indeed, it may well be that he arrived at important features of his device independently, perhaps even intuitively. The independent solving of a problem, however, does not indicate the nonobviousness of that solution. Were it so, then teachings of prior art which are now available to the public would be subject to capture by the patentee who, unaware of the teaching, happened to arrive at the same idea or an obvious extension thereof.

■ Mindful that it is essential to avoid hindsight in its analysis, the Court nevertheless is convinced that the fastening solution arrived at by Hoadley would have been obvious to the skilled engineer in the fastening art. The presence of secondary factors which favor patentability, such as the commercial success of the product and the limitation of others, does not divert the Court from this conclusion. Though such factors should not be given "short-shrift" where obviousness is not clear, *Shackelton v. J. Kaufman Iron Works, Inc.,* 689 F.2d 334, 338 (2d Cir.1982), it is nevertheless established that "secondary considerations will not support a claim of invention if the subject-matter of the patent does not pass the section 103 test of non-obviousness". *Owens-Illinois, Inc. v. Emhart Industries, Inc.,* 644 F.2d 98, 100 (2d Cir.1981), citing, *Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 282–83, 96 S.Ct. 1532, 1538, 47 L.Ed.2d 784; *Digitronics Corp. v. New York Racing Association,* 553 F.2d 740, 748–49 (2d Cir.1977); *Julie Research Laboratories, Inc. v. Guidelines Instruments, Inc., supra* at 1135–36 (2d Cir.1974). *See also, Janex Corp. v. Bradley Time, supra,* 460 F.Supp. at 389 (S.D.N.Y. 1978) ("commercial success 'cannot breathe life into a patent otherwise invalid because of obviousness'") *quoting, Continental Can Co. v. Old Dominion Box Co.,* 393 F.2d 321 (2d Cir.1968).

Therefore, while the Hoadley invention constituted a practical and commercially popular means of fastening, the Court is persuaded by what it regards to be clear and convincing evidence that the subject matter of the Hoadley patent would have been obvious to a skilled engineer in the fastener field at the time the invention was made. The patent is therefore invalid under 35 U.S.C. § 103.

Accordingly, judgment is hereby granted for the plaintiff on its claim, and United States Patent No. 3,802,476 entitled "SCREW ANCHOR" and naming James E. Hoadley as its inventor is declared invalid. 35 U.S.C. § 103.

All other claims and counterclaims in this section are dismissed. Fed.R.Civ.P. 41(b).

IT IS SO ORDERED.

## APPENDIX A
Diagram of Hoadley Screw Anchor*

*Fig.1*

*Fig.2*

*Fig.3*

*Fig.5*

*Fig.4*

* Photocopied from Hoadley Patent, Plaintiff's Exhibit 2.
Order and position of figures changed for comparison purposes.

1294

Fig. 6    Fig. 8.

Fig. 7.

* Photocopied from enlargement of Knowlton Patent. Plaintiff's
Exhibit 4. Order and position of figures changed for com-
parison purposes. Other figures in the patent not shown.

## APPENDIX C

Bottom View of Knowlton Fastener[*]

KNOWLTON - BOTTOM VIEW

*Photocopied from sketch by E. Sneck. Plaintiff's
Exhibit 10B.

## APPENDIX D
### Diagram of Krueger Fastener*

FIG. 1

FIG. 2

FIG. 3

FIG. 4

FIG. 5

FIG. 6

FIG. 7

FIG. 8

FIG. 9

*Photocopied from Krueger Patent, Plaintiff's Exhibit 6.

## APPENDIX E

Diagram of Simmons Back-up Plate*

Top View

Bottom View

*Photocopied from sketch prepared for litigation. Plaintiff's Exhibit 3A and 3B. Order and position of figures changed for comparison purposes.